COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Humphreys and Kelsey
Argued at Richmond, Virginia


ROBERT C. JOHNSON
                                              OPINION BY
v.   Record No. 0256-02-2    CHIEF JUDGE JOHANNA L. FITZPATRICK
                                            MAY 20, 2003
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                     Cleo E. Powell, Judge

          Todd M. Ritter (Daniels & Morgan, on brief),
          for appellant.

          Margaret W. Reed, Assistant Attorney General
          (Jerry W. Kilgore, Attorney General, on
          brief), for appellee.


     Robert C. Johnson (appellant) was convicted in a bench

trial of two counts of rape in violation of Code § 18.2-61, two

counts of forcible sodomy in violation of Code § 18.2-67.1 and

two counts of indecent liberties with a child in violation of

Code § 18.2-370.1.  On appeal, appellant contends that:  (1)

Code § 18.2-67.9, which allows child victims to testify via

closed circuit television, is unconstitutional, both facially

and as applied to him; (2) the Commonwealth failed to carry its

burden to show that the child was unable to testify in person;

and (3) the evidence was insufficient to support the

convictions.  For the reasons that follow, we affirm.

## I. Background

Under familiar principles of appellate review, we examine the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. See Juares v. Commonwealth, 26 Va. App. 154, 156, 493 S.E.2d 677, 678 (1997).

In February 1998, Antrina Stokes Johnson, appellant's girlfriend, gained temporary custody of her four-year-old cousin, M.[1] In May 1998, appellant, Johnson, her son L, and M moved to Virginia where appellant worked the night shift as a jail guard. Johnson worked at Wachovia Bank from 10:00 a.m. to 3:00 p.m. and was responsible for the care of both children.

In January 1999 appellant and Johnson were married in Virginia. In order to save money for a wedding ceremony in New York, Johnson worked nights at a Food Lion from June 11, 1999 to July 26, 1999. Because appellant also worked nights, Johnson arranged for a neighbor, Keshia Light, to babysit M and L when she worked at Food Lion. From approximately mid-June to mid-July 1999, M visited her grandmother in New York. M returned to Virginia in mid-July, with L, appellant's two children from a prior marriage and appellant's niece. The

---

[1] M had been living with her paternal grandmother in New York state since she was three days old. The record shows that M was born while her mother was in jail. M's grandmother had physical custody of her continuously until she was 18 months old. After that time, M lived with her mother and her grandmother during the time her mother was incarcerated. The record is unclear why custody changed from the grandmother to

entire family returned to Buffalo, New York on August 20, 1999, and Johnson returned custody of M to her father at that time.[2]

On December 4, 2000, North Carolina Child Protective Services (CPS) took custody of M, age seven, from her father and placed her in foster care with Matty Williams. When she arrived at Williams' home, Williams gave her a bath. Consistent with her normal practice, Williams asked M to show Williams her private parts and asked M if anyone had ever touched her there. M replied, "No ma'am." A few days later, M complained to Williams of blood in her urine. After a visit to the doctor, M told Williams "whenever my cousin would go to work, . . . her husband would come to my room . . . he would make me put his private in my mouth." At one point, M told Williams that she thought appellant was trying to kill her. When asked why, M said "he put his privates into her, and she couldn't breathe. That's why she thought he was trying to kill her." M initially told Williams that she was five when this occurred; but later said she was six. M identified appellant as the person who committed the acts.

Dr. Sarah Sinal, a professor of pediatrics at Wake Forest University, performed a complete physical on the child. She found that the child's "hymen appeared asymmetric with

_____

the Johnsons.

[2] M then spent approximately a month with her father before leaving with her paternal grandmother to go to California. At the end of one year, M was returned to North Carolina and

- 3 -

significant narrowing between twelve and two o'clock." Dr. Sinal stated that "some children have narrower hymens than others. But in general there is a fair amount of symmetry." Dr. Sinal attributed the condition of M's hymen to trauma "and as it healed there was a loss of tissue." Dr. Sinal stated that M "had a physical injury . . . that was compatible with having been painfully penetrated." Dr. Sinal's medical opinion was that M was "a sexually abused child."

The Commonwealth filed a pretrial motion pursuant to Code § 18.2-67.9 to allow M to testify via two-way closed circuit television. The trial court conducted two hearings on the motion and received testimony from two experts, Detective Sherry Kendall and Dr. Pamela Waaland, a licensed clinical psychologist who specialized in child and adolescent psychology and neuropsychology. Dr. Waaland testified that "it would be very traumatic" for M to testify. "In fact, [M] told [Waaland] she wouldn't be able to do it and she would run out of court and run away." (Emphasis added). M told Waaland she would feel "scared" if she had to testify in front of appellant. The experts concluded that M would likely suffer severe emotional trauma if she had to testify in front of appellant. The trial court granted the Commonwealth's motion over appellant's objection.

The trial court convicted appellant of two counts of rape, two counts of forcible sodomy and two counts of indecent

---

remained in North Carolina with her father and stepmother.

liberties with a child and sentenced him to 40 years for each charge of rape and each charge of forcible sodomy, and 5 years for each count of indecent liberties, for a total of 170 years. The trial court ordered that appellant serve his sentences concurrently, and suspended 30 years and 9 months of each rape and sodomy sentence, leaving nine years, three months to be served.

## II.  Constitutionality of Code § 18.2-67.9

Appellant first contends that Code § 18.2-67.9 is constitutionally infirm, both facially and as applied to him, because it violates his Sixth Amendment right to confront the witnesses against him.  We disagree.

## A.  Facial Validity

"In assessing the constitutionality of a statute, we must presume that the legislative action is valid.  The burden is on the challenger to prove the alleged constitutional defect." Woolfolk v. Commonwealth, 18 Va. App. 840, 848, 447 S.E.2d 530, 534 (1994).  "Every act of the legislature is presumed to be constitutional, and the Constitution is to be given a liberal construction so as to sustain the enactment in question, if practicable."  Moses v. Commonwealth, 27 Va. App. 293, 298, 498 S.E.2d 451, 454 (1998).

> It has long been established that every presumption is to be made in favor of an act of the legislature, and it is not to be declared unconstitutional except where it is clearly and plainly so. Courts uphold acts of the legislature when their constitutionality is debatable, and the burden is upon the assailing party to prove the claimed invalidity.

Santillo v. Commonwealth, 30 Va. App. 470, 476, 517 S.E.2d 733, 736 (1999) (citing Peery v. Virginia Board of Funeral Directors and Embalmers, 203 Va. 161, 165, 123 S.E.2d 94, 97 (1961)).

"The Sixth Amendment's Confrontation Clause, made applicable to the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.'" Ohio v. Roberts, 448 U.S. 56, 62-63 (1980). However, the Supreme Court has "never held . . . that the Confrontation Clause guarantees criminal defendants the absolute right to a face-to-face meeting with witnesses against them at trial." Maryland v. Craig, 497 U.S. 836, 844 (1990) (emphasis in original). Instead, "certain narrow circumstances . . . may warrant dispensing with confrontation at trial." Id. at 848.

> To be sure, face-to-face confrontation may be said to cause trauma for the very purpose of eliciting truth but we think that the use of Maryland's special procedure, where necessary to further the important state interest in preventing trauma to child witnesses in child abuse cases, adequately ensures the accuracy of the testimony and preserves the adversary nature of the trial. Indeed, where face-to-face confrontation causes significant emotional distress in a child witness, there is evidence that such confrontation would in fact disserve the Confrontation Clause's truth-seeking goal.

- 6 -

<u>Id.</u> at 856-57 (emphasis in original).

In <u>Craig</u>, the Supreme Court considered a Maryland statute similar to Code § 18.2-67.9 and held that where

> the State makes an adequate showing of
> necessity, the state interest in protecting
> child witnesses from the trauma of
> testifying in a child abuse case is
> sufficiently important to justify the use of
> a special procedure that permits a child
> witness in such cases to testify at trial
> against a defendant in the absence of
> face-to-face confrontation with the
> defendant.

<u>Id.</u> at 855. <u>Craig</u> established three further requirements: (1) the finding of necessity must be case-specific; (2) the child must be "traumatized, not by the courtroom generally, but by the presence of the defendant"; and (3) the emotional distress suffered by the child witness must be more than "mere nervousness or excitement or reluctance to testify." <u>Id.</u> at 855-56. All three requirements are embodied in Code § 18.2-67.9.

Code § 18.2-67.9 provides:

> A. The provisions of this section shall
> apply to an alleged victim who was fourteen
> years of age or under at the time of the
> alleged offense and is sixteen or under at
> the time of the trial and to a witness who
> is fourteen years of age or under at the
> time of the trial.
>
> In any criminal proceeding, including
> preliminary hearings, involving an alleged
> offense against a child, relating to a
> violation of the laws pertaining to
> kidnapping (§ 18.2-47 et seq.), criminal
> sexual assault (§ 18.2-61 et seq.) or family
> offenses pursuant to Article 4 (§ 18.2-362
> et seq.) of Chapter 8 of Title 18.2, or
> involving an alleged murder of a person of
> any age, the attorney for the Commonwealth
> or the defendant may apply for an order from

- 7 -

the court that the testimony of the alleged victim or a child witness be taken in a room outside the courtroom and be televised by two-way closed-circuit television.  The party seeking such order shall apply for the order at least seven days before the trial date or at least seven days before such other preliminary proceeding to which the order is to apply.

B.  The court may order that the testimony of the child be taken by closed-circuit television as provided in subsection A if it finds that the child is unavailable to testify in open court in the presence of the defendant, the jury, the judge, and the public, for any of the following reasons:

1.  The child's persistent refusal to testify despite judicial requests to do so;

2.  The child's substantial inability to communicate about the offense; or

3.  The substantial likelihood, based upon expert opinion testimony, that the child will suffer severe emotional trauma from so testifying.

Any ruling on the child's unavailability under this subsection shall be supported by the court with findings on the record or with written findings in a court not of record.

C.  In any proceeding in which closed-circuit television is used to receive testimony, the attorney for the Commonwealth and the defendant's attorney shall be present in the room with the child, and the child shall be subject to direct and cross-examination.  The only other persons allowed to be present in the room with the child during his testimony shall be those persons necessary to operate the closed-circuit equipment, and any other person whose presence is determined by the court to be necessary to the welfare and well-being of the child.

> D. The child's testimony shall be
> transmitted by closed-circuit television
> into the courtroom for the defendant, jury,
> judge and public to view. The defendant
> shall be provided with a means of private,
> contemporaneous communication with his
> attorney during the testimony.

By its terms, the statute requires a "case-specific" showing of necessity. Specifically, in accordance with Craig's mandate, Code § 18.2-67.9(B) requires the trial court to find that the child is unavailable to testify in open court in the presence of the defendant because: the child refuses to testify; the child is unable to communicate; or there is a "substantial likelihood . . . that the child will suffer severe emotional trauma." Thus Code § 18.2-67.9 satisfies all the requirements set forth in Craig. Additionally, any ruling that the child is unavailable must be supported by findings on the record.

Furthermore, Code § 18.2-67.9 preserves for the defendant

> all of the other elements of the
> confrontation right: the child witness must
> be competent to testify and must testify
> under oath; the defendant retains full
> opportunity for contemporaneous
> cross-examination; and the judge, jury, and
> defendant are able to view (albeit by video
> monitor) the demeanor (and body) of the
> witness as he or she testifies.

Craig, 497 U.S. at 851. Indeed, Code § 18.2-67.9 goes beyond the requirements of Craig by providing for testimony via two-way closed-circuit television, rather than the one-way closed-circuit television testimony upheld in Craig. This additional element provides even greater protections for a criminal defendant and more closely mirrors a courtroom environment. For example, it allows the trial judge to make instantaneous rulings on

- 9 -

objections or give instructions to the witness without any break in the proceedings.  "[W]e think these elements of effective confrontation not only permit a defendant to 'confound and undo the false accuser, or reveal the child coached by a malevolent adult,' but may well aid a defendant in eliciting favorable testimony from the child witness."  Id. (quoting Coy v. Iowa, 487 U.S. 1012, 1021 (1988)).  Accordingly, we hold that Code § 18.2-67.9 comports with the requirements of both Craig and the Sixth Amendment's Confrontation Clause.

## B.  Validity as Applied

Next, appellant contends that even if Code § 18.2-67.9 is constitutional as drafted, it is unconstitutional as applied to him.  Appellant argues that the trial court failed to require that the trauma would have a "distorting" effect on the child's testimony or that the trauma was so severe that the use of the closed-circuit television system was "necessary" because the witness would otherwise be unable to testify.  We disagree.

Having found Code § 18.2-67.9 constitutional, we need only determine whether the trial court adhered to the statutory requirements in this case.  The trial court found

> that the victim is unable to testify in open
> court in the presence of the defendant, the
> jury, the judge and the public; and . . .
> the finding of unavailability is based on
> expert testimony that there is a substantial
> likelihood that the child will suffer severe
> emotional trauma from so testifying.

The record establishes that the trial court took the additional step of requiring the Commonwealth to have M undergo an independent psychological examination prior to making a decision

- 10 -

on the necessity of using closed-circuit television at trial. The psychologist opined that "it would be very traumatic" for M to testify in open court in front of appellant. Dr. Waaland specifically stated that if required to testify, M said "she wouldn't be able to [testify in front of appellant] and she would run out of court and run away." (Emphasis added). Despite appellant's contention that there was no connection between M's fear of testifying in front of appellant and her ability to testify, the record is clear. Thus, there was a finding of "necessity" in the instant case and the evidence before the trial court supported that finding.

The record also proves that the "other elements" of appellant's confrontations rights were met. Specifically, the trial court found M to be competent to testify; she testified under oath; appellant retained the full opportunity for contemporaneous cross-examination; and the fact finder was able to view M's demeanor. See Craig, 497 U.S. at 851. Additionally, appellant had the opportunity to communicate privately with his counsel during M's remote testimony. The trial court followed the statutory requirements and applied them correctly. We therefore conclude that the application of Code § 18.2-67.9 in the instant case did not violate appellant's constitutional protections.

### III. Unavailability of Child Victim

Next, appellant contends that the Commonwealth failed to carry its burden of proving a substantial likelihood that the child victim would suffer severe emotional trauma as a result of

testifying in open court in his presence.  Appellant argues that the experts did not sufficiently substantiate their conclusions of "severe emotional trauma."

"In determining the weight to be given the testimony of an expert witness, the fact finder may consider the basis for the expert's opinion.  The credibility and weight of witnesses' testimony is determined by the fact finder."  Parrish v. Commonwealth, 38 Va. App. 607, 613, 567 S.E.2d 576, 578-79 (2002).  "While . . . nervousness by itself is insufficient to establish severe emotional trauma, the evidence here included more than nervousness."  Id. at 612-13, 567 S.E.2d at 578.

The Commonwealth offered two experts at the pretrial hearing to determine the appropriateness of closed-circuit television testimony.  Both experts, Dr. Waaland and Detective Kendall, opined that M would suffer severe emotional distress if she had to testify in front of appellant and was "withdrawn."  Because of this, it would be unlikely M would be capable of testifying in appellant's presence.

Dr. Waaland stated that she met personally with M and performed various psychological tests.  These included self-esteem and anxiety measurements, "projective drawings" and "some intelligence testing to make sure that [M's] reasoning, judgment, memory was intact [sic]."  Dr. Waaland stated, "[M] has low self-esteem.  She reports feeling ashamed.  On the anxiety measures, [M] scored very high, which puts her at risk."  Dr. Waaland testified that "it would be very traumatic" for M to testify in front of appellant.  "In fact, [M] told [Dr. Waaland] she wouldn't be able to do it and she would run out of court and

- 12 -

run away."  M told Dr. Waaland she would feel "scared" if she had to testify in front of appellant.

Code § 18.2-67.9 does not require a finding that the testimony would be "distorted."  Rather it requires the trial court to find a substantial likelihood that M would suffer severe emotional trauma as a result of testifying in open court in front of appellant.  This determination was based on the testimony of two experts, whose credibility was for the trier of fact to determine.  Credible evidence supports the trial court's finding.

## IV.  Sufficiency of the Evidence

Lastly, appellant contends the evidence was insufficient to support the convictions.  He argues that the victim's testimony was inherently incredible and the evidence proved a lack of opportunity for him to commit the crimes.

"When the sufficiency of the evidence is challenged on appeal, we determine whether the evidence, viewed in the light most favorable to the prevailing party, the Commonwealth, and the reasonable inferences fairly deducible from that evidence support each and every element of the charged offense."  Haskins v. Commonwealth, 31 Va. App. 145, 149-50, 521 S.E.2d 777, 779 (1999).  "In so doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom."  Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998).

## A.  M's Credibility

"Witness credibility, the weight accorded the testimony and

- 13 -

the inferences to be drawn from proven facts are matters to be determined by the fact finder." Byers v. Commonwealth, 37 Va. App. 174, 179, 554 S.E.2d 714, 716 (2001). "The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." Reynolds v. Commonwealth, 30 Va. App. 153, 163, 515 S.E.2d 808, 813 (1999).

M testified unequivocally that appellant "told [her] to suck his private part" and that he put his private part "in [her] mouth." Then, "He told me to lay back down. . . . He got on top of me . . . [and] [h]e put his private part into mine." M stated that she could not breathe because appellant, who weighed 310 pounds, was laying on her stomach. When asked how she knew appellant was inside her, M stated "because I feeled [sic] it. . . . It hurted [sic]." She stated that this activity happened on more than one occasion and that each time was the same. M said she told appellant to "stop" but that he did not. She explained that she did not tell her cousin "Cause he told me not to. I was scared."

This account comports with the other evidence adduced at trial. First, M gave her foster mother, Matty Williams, a substantially similar account when she initially made her complaint. Williams stated that M told her that she thought that appellant was trying to kill her because he was so heavy she could not breathe. "[M] said [appellant] put his privates into her, and she couldn't breathe. That's why she thought he was trying to kill her." Additionally, M's testimony is consistent

- 14 -

with a drawing she did at Dr. Waaland's instruction.

> She drew a picture of herself underneath, on the bed, [appellant] on top of her. At first she draw [sic] him her size, then she erased and said he was big, he smothered me, and very large out of her mouth she draw [sic] a little [balloon] that said, Stop, and she was screaming.

Finally, the medical evidence showed that M "is a sexually abused child." Dr. Sinal explained that M's hymen had narrowing at the twelve to two position and that it was asymmetrical. Dr. Sinal stated that in her medical opinion the condition of M's hymen was consistent with "a painful penetrating injury." Credible evidence supported M's account.

## B. Lack of Opportunity

Lastly, appellant contends that he lacked the opportunity to commit the crimes. M stated that appellant subjected her to the abuse at night while her cousin was at work. She also stated that the only other person in the house on these occasions was Johnson's son, L.

At trial, appellant submitted his work records and those of his wife.[3] Several witnesses testified regarding the summer visitation M had with her paternal grandmother and appellant's summer visitation with his children from a prior marriage. Taken together, this evidence showed that there were only two possible nights (June 11 and 15) that satisfied the conditions M

---

[3] There were a total of eleven days appellant was not at work but Johnson was working at night. They were: June 11, 15, 24, and 28 and July 3, 7, 8, 12, 15, 21 and 26.

gave.  Although both Johnson and Light testified that Light
generally watched the children when Johnson was working, neither
could say whether the children were with Light on those two
evenings.

The trial court stated,

> I think the case is about who you believe
> . . . it basically comes down to two people.
> It comes down to [M] and it comes down to
> [appellant].  And it comes down to who I
> believe.  Because if I believe [M], then
> [appellant] can't be telling the truth.  And
> if I believe [appellant] then [M] can't be
> telling the truth. . . .
>
> [T]here are some issues of timing and
> elements of time and where she was and who
> [M] was with . . . and [counsel] does a good
> job of narrowing it down to possibly two
> nights.
>
>    *    *    *    *    *    *    *
>
> It comes down to who I believe.  That's what
> it comes down to. . . . And so I come down
> to why would [M] say it was you, Mr.
> Johnson?  And God help me if I'm wrong, but
> the only conclusion I can come to, sir, is
> because it was you.

Credible evidence supports the trial court's findings.

Accordingly, the judgment of the trial court is affirmed.

<u>Affirmed.</u>