**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-4178**

_____

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

EVERETT LEE MAYNARD,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Irene C. Berger, District Judge.  (2:21−cr−00065−1)

_____

Argued:  October 27, 2023                                  Decided:  January 11, 2024

_____

Before DIAZ, Chief Judge, WILKINSON, Circuit Judge, and Robert S. BALLOU, United States District Judge for the Western District of Virginia, sitting by designation.

_____

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion in which Judge Wilkinson and Judge Ballou joined.

_____

**ARGUED:**  Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Barbara Ann Schwabauer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Wesley P. Page, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Kristen Clarke, Assistant Attorney General, Erin H. Flynn, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William S. Thompson, United States Attorney, Nowles

Heinrich, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

DIAZ, Chief Circuit Judge:

Everett Maynard was tried on one count under 18 U.S.C. § 242 for his use of force against an arrestee. At trial, the district court required witnesses to testify wearing opaque face masks because of the COVID-19 pandemic. The jury found Maynard guilty, and the district court sentenced him to 108 months' imprisonment.

Maynard asks us to vacate his conviction on the ground that the mask requirement violated his Sixth Amendment right to confront the witnesses against him at trial. Alternatively, he asks that we vacate his sentence because the district court erred in applying sentencing enhancements for obstruction of justice and for causing "serious bodily injury."

Finding no error, we affirm Maynard's conviction and sentence.

## I.

### A.

Maynard was an officer with the Logan Police Department in West Virginia. In October 2020, he and another officer, Andrew Bias, arrested Robert Wilfong for public intoxication and having outstanding warrants. Audio and video evidence from the trial shows that at the police station, Wilfong asked repeatedly to use the bathroom. After Bias and Maynard ignored several requests, and Bias yelled at Wilfong to "shut the fuck up," Maynard eventually agreed to escort him. When Wilfong entered the bathroom, Maynard put on a pair of black gloves and turned to Bias telling him that "tonight's the night."

Maynard then raised his middle finger to the security camera before walking over to the bathroom door to supervise Wilfong.

Maynard began to yell at Wilfong: "Remember I said you don't make demands of me?" Maynard then entered the bathroom, out of view of the camera. The audio captured a series of loud noises, along with Maynard yelling, "Do you remember it?" When Wilfong reappeared in the video, he was on the ground, and Maynard was dragging him out of the bathroom. Maynard lifted him off the ground and yelled, "You were big and brave just a minute ago weren't you, you were making fucking demands of me."

Maynard carried Wilfong into the other room, slamming his head into a doorframe on the way. Maynard then dropped him, instructed Bias to call an ambulance, and stated, "I went too fucking far." Wilfong remained on the ground motionless for several minutes while a pool of blood formed around his head.

Wilfong was transported to a hospital, where he was diagnosed with a broken nose and lacerations to his upper head. He received seven staples to close the head laceration and was referred to a maxillofacial surgeon.

## B.

Maynard was indicted on one count of deprivation of rights under color of law pursuant to 18 U.S.C. § 242. Before trial, the district court ordered all persons, including witnesses, to "wear a face covering or mask, which covers both the wearer's nose and mouth, *at all times*." J.A. 12. Maynard challenged the order, arguing that it violated his right under the Sixth Amendment to confront witnesses. In lieu of face masks, Maynard asked the court to permit the use of a clear face shield.

4

The district court denied the motion, finding that the mask requirement was "necessary to ensure the safety of those present," J.A. 23, and that "face shields have not proven as effective as masks that cover the nose and mouth and seal around the wearer's face," J.A. 23 (footnote omitted).

C.

At trial, the government played the audio and video recording of the incident. And both Bias and Logan Police Chief Paul Clemens testified for the government while wearing face masks.

Bias testified that the "hard-knuckle" gloves Maynard put on are used "whenever you are cuffing somebody, if you are in a fight with somebody, if you get into a hot situation." J.A. 139. While Maynard and Wilfong were in the bathroom, he heard "what sounded like punches being thrown or something, some type of fighting." J.A. 126. Bias didn't see Maynard trip or lose his balance before he slammed Wilfong into the doorframe, and thought that Maynard's action was "an aggressive move." J.A. 146.

Bias and Clemens testified about statements Maynard made after the incident. According to Bias, Maynard stated, "Motherfuckers want to talk shit until they're laying in a puddle of their own blood." J.A. 160. He also testified that Maynard told the EMTs that Wilfong fell. And Clemens testified that Maynard called him after the incident, stating, "I think I really screwed up this time. I think I've hurt him bad or I may have killed him." J.A. 62.

Maynard testified in his own defense. He claimed that while in the bathroom, Wilfong grabbed for Maynard's gun. Maynard also claimed that he lost his balance while

5

he carried Wilfong from the bathroom, and that he knocked Wilfong into the doorframe by accident.

The jury returned a guilty verdict.

D.

The presentence investigation report recommended a five-level sentencing enhancement under guideline 2A2.2(b)(3)(B), which applies if the victim sustained "serious bodily injury." The report also recommended a two-level enhancement under guideline 3C1.1 for obstruction of justice on the ground that Maynard perjured himself by testifying that he injured Wilfong accidentally.

At sentencing, Maynard objected to the "serious bodily injury" enhancement. The district court overruled his objection, explaining that "[Wilfong] was knocked unconscious and was bleeding profusely from his head. He was taken to the hospital for emergency medical treatment, including seven staples to his scalp, and he suffered a broken nose that resulted in a referral to a specialist for reconstruction." J.A. 528. The court concluded that "[Wilfong's] injuries would have caused extreme physical pain and he needed to be taken to the hospital in an ambulance for treatment." J.A. 529.

Maynard didn't object to the report's recommendation that the obstruction of justice enhancement applied. And the district court applied it, finding that Maynard committed perjury when he testified that the incident was an accident.

The district court calculated the advisory guideline range of 108 to 135 months in prison, and sentenced Maynard to 108 months.

This appeal followed.

6

II.

Maynard challenges his conviction on the ground that requiring witnesses to testify while wearing masks violated his rights under the Sixth Amendment's Confrontation Clause. We review such challenges de novo. *United States v. Mouzone*, 687 F.3d 207, 213 (4th Cir. 2012) (cleaned up).

A.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The clause guarantees defendants the right to a "face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) (cleaned up). This right is "essential to a fair trial in a criminal prosecution," *id.* at 1017 (cleaned up), because it makes it more difficult for a witness to lie and preserves the opportunity for cross-examination, *see id.* at 1017, 1019.

Applying these principles in *Coy*, the Supreme Court held that the defendant's confrontation right was violated where witnesses were permitted to testify behind a screen, such that the defendant could hear the witnesses and "dimly" see them, but the witnesses couldn't see the defendant. *Id.* at 1014–15, 1022. There, the Court declined to consider whether any exceptions to the face-to-face requirement existed. *Id.* at 1021.

But the Court later recognized that the right to confrontation isn't absolute. In *Maryland v. Craig*, the Court held that the right is satisfied "absent a physical, face-to-face confrontation" where two conditions are met. 497 U.S. 836, 850 (1990) (cleaned up). First,

7

the denial of such confrontation must be "necessary to further an important public policy." *Id.* Second, the "reliability of the testimony" must be "otherwise assured." *Id.*

Applying this test, the Court considered the constitutionality of a procedure where child witnesses were permitted to testify out of the defendant's presence via one-way, closed-circuit video. *Id.* at 840. The Court held that if the state on remand made an "adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify" the procedure. *Id.* at 855. And it explained that such testimony would "preserve all of the other elements of the confrontation right," including that the witnesses would be competent to testify, under oath, subject to cross-examination, and the judge, jury, and defendant could view the witness's demeanor. *Id.* at 851.

## B.

Relying on *Craig*, the district court determined that the witnesses' testimony while wearing masks didn't violate the Confrontation Clause. We agree.

Protection against the spread of COVID-19 is no doubt an "important public policy" interest. *Craig*, 497 U.S. at 850 (cleaned up). By the time of Maynard's trial in November 2021, more than 700,000 people in the United States had died from COVID-19. *Covid Data Tracker*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/ - trends_select_select_00 [https://perma.cc/3ZAB-G7WG] (select "cumulative deaths" from "View (left axis)" dropdown). In West Virginia alone, nearly 5,000 people had died. *Id*. (select "West Virginia" from "Select a geographic area" dropdown and "cumulative deaths" from "View (left axis)" dropdown). And West Virginia was dealing

8

with more than 350 new hospitalizations, *id.* (select "West Virginia" from "Select a geographic area" dropdown and "Weekly COVID-19 New Hospital Admissions per 100,000" from "View (right axis)" dropdown), and 100 deaths, each week, *id.* (select "West Virginia" from "Select a geographic area" dropdown and "Weekly Deaths" from "View (left axis)" dropdown).

At that time, the Centers for Disease Control and Prevention (CDC) recommended that even vaccinated people wear masks indoors when in public in areas with substantial transmission. Nat'l Ctr. for Immunization & Respiratory Diseases, *Interim Public Health Recommendations for Fully Vaccinated People*, Ctrs. for Disease Control & Prevention, https://stacks.cdc.gov/view/cdc/110779 [https://perma.cc/SU2S-UMDS] (last updated Oct. 15, 2021). It also recommended that those who were immunocompromised wear masks regardless of the level of community transmission. *Id*. And earlier CDC guidance advised against the use of face shields as substitutes for masks because there wasn't enough evidence to support their effectiveness. *Considerations for Wearing Masks*, Ctrs. for Disease Control & Prevention, http://web.archive.org/web/20200810031416/https:/www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html (last updated Aug. 7, 2020).

Against this backdrop, we think the district court's mask order was "necessary to further an important public policy." *Craig*, 497 U.S. at 850 (cleaned up). The court could have permitted the use of clear face shields as Maynard requested. But considering the CDC guidance and the number of COVID-19 related deaths and hospitalizations at the time, it would be "the worst kind of hindsight" to say that the district court needed to do

9

so. *See United States v. Pair*, 84 F.4th 577, 585 (4th Cir. 2023) (holding that COVID-19 risks justified trial delays under the Speedy Trial Act).

Maynard insists that *Crawford v. Washington*, 541 U.S. 36 (2004), undermined *Craig*'s holding. We cannot agree.

In *Crawford*, the Supreme Court held that testimonial hearsay statements couldn't be admitted at trial absent unavailability and a prior opportunity for cross-examination. *Id.* at 68. This abrogated the Court's decision in *Ohio v. Roberts*, which held that an unavailable witness's hearsay statement could be admitted at trial so long as it had "adequate 'indicia of reliability.'" 448 U.S. 56, 66 (1980).

*Crawford* rejected this test, explaining that the Sixth Amendment requires that reliability "be assessed in a particular manner: by testing in the crucible of cross-examination." 541 U.S. at 61–62. *Craig*, in turn, relied heavily on *Roberts*. Still, because *Crawford* didn't overrule *Craig*, we're bound to treat it as good law. *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam) (explaining that Supreme Court decisions "remain binding precedent . . . regardless of whether subsequent cases have raised doubts about their continuing vitality" (cleaned up)).

Importantly, the reliability of the witnesses' testimony in this case was "otherwise assured." *Craig*, 497 U.S. at 850 (cleaned up). As in *Craig*, the witnesses were under oath, cross-examined, and the jury could observe their demeanor.

And that's not all. The witnesses were physically present in the courtroom and could see and be seen by both the defendant and the jury. Thus, Maynard's trial was even "more protective of the defendant's interests" than was the case in *Craig*. *See United States*

10

*v. Abu Ali*, 528 F.3d 210, 241–42 (4th Cir. 2008) (finding no Confrontation Clause violation where government played deposition testimony taken outside the defendant's physical presence via two-way video conference).

Maynard protests that the masks hindered the jury's ability to assess the witnesses' credibility. But jurors assess credibility not only by facial expressions, but also by "the words the witnesses said . . . how they said them . . . their body language, their pauses, their mannerisms[,] and all the other intangible factors that are present in a trial." *Burgess v. Goldstein*, 997 F.3d 541, 554 (4th Cir. 2021). So we can't say that a mask covering only a witness's nose and mouth violates the Confrontation Clause.

Finally, we note that the masking procedure at Maynard's trial is unlike any the Supreme Court has considered in the Confrontation Clause context. Prior cases involved a screen separating the witness and defendant, *Coy*, 487 U.S. at 1014, testimony by one-way video, *Craig*, 497 U.S. at 840, and out-of-court statements introduced at trial, *Roberts*, 448 U.S. at 58; *Crawford*, 541 U.S. at 38.

By contrast, the witnesses here testified live, in person, under oath, subject to cross-examination, and could see and be seen by the defendant and jury. In short, Maynard's trial preserved the Confrontation Clause's core principles—physical presence and the opportunity for cross-examination. *See Coy*, 487 U.S. at 1017–20.

We therefore affirm the district court's ruling rejecting Maynard's Confrontation Clause challenge.

III.

11

Next, we consider Maynard's claim that the district court erred in applying a sentencing enhancement for causing "serious bodily injury." Because Maynard objected to this enhancement at sentencing, we review the district court's factual findings for clear error and legal conclusions de novo. *United States v. Strieper*, 666 F.3d 288, 292 (4th Cir. 2012) (cleaned up).

## A.

In calculating a defendant's offense level, the sentencing guidelines contemplate a five-level increase if the victim sustained "serious bodily injury." U.S.S.G. § 2A2.2(b)(3)(B). The guidelines define "serious bodily injury" as injury "involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 app. n.1(M).

## B.

Recall that Wilfong was knocked unconscious and was bleeding profusely from the head. He was taken to the hospital where he was diagnosed with a broken nose and lacerations to the upper head. He received seven staples to his scalp and was referred to a maxillofacial specialist for further treatment.

Maynard contends that these injuries didn't involve "extreme" pain, and that the district court's finding otherwise was the "sole basis" for increasing his offense level. Not so.

The district court didn't rely solely on its finding that Wilfong suffered extreme pain. Rather, it noted that Wilfong's injuries "would have caused extreme physical pain

12

*and* he needed to be taken to the hospital in an ambulance for treatment." J.A. 529 (emphasis added). That Wilfong required medical intervention is itself an independent basis to support the enhancement. U.S.S.G. § 1B1.1 app. n.1(M) (defining "serious bodily injury" as suffering extreme pain "*or* requiring medical intervention such as surgery, hospitalization, or physical rehabilitation" (emphasis added)); *see also United States v. Flores*, 974 F.3d 763, 766 (6th Cir. 2020) (finding the need for sutures was sufficient "medical intervention" to support the offense level increase).

We've affirmed the application of the five-level increase when a defendant inflicted less severe injuries. In *United States v. Saint Louis*, the victim was "beaten extensively" around her face, sustained a broken blood vessel in her eye, and was bleeding from her arm and nose. 889 F.3d 145, 158 (4th Cir. 2018). Yet we affirmed application of the increase even though the victim didn't seek medical help and didn't suffer "protracted impairment" of her eye. *Id.*

Because Maynard's victim suffered more severe injuries that *did* require medical attention, we have little trouble concluding that the district court didn't err, much less clearly err, in applying the five-level increase.

## IV.

Finally, Maynard challenges the district court's application of a sentencing enhancement for obstruction of justice. Because Maynard didn't object to this enhancement at sentencing, we review for plain error. *Strieper*, 666 F.3d at 292 (cleaned up).

### A.

13

Sentencing guideline 3C1.1 authorizes a two-level enhancement if the defendant (1) "willfully obstructed or impeded . . . the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1.

The guideline's commentary provides a non-exhaustive list of conduct covered by the guideline, including committing perjury. U.S.S.G. § 3C1.1 app. n.4(B). Generally, a guideline's commentary is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *United States v. Campbell*, 22 F. 4th 438, 443 (4th Cir. 2022) (cleaned up).

### B.

Maynard contends that the commentary's inclusion of perjury as covered conduct contradicts the guideline. That's not correct.

We addressed a perceived conflict between a guideline and its commentary in *Campbell*. There, we considered whether a "controlled substance offense" under guideline 4B1.1(a)(3) included an *attempt* to deliver a controlled substance. *Id.* at 440.

The guideline defined "controlled substance offense" to include offenses prohibiting the "manufacture, import, export, distribution, or dispensing of a controlled substance," or possession of the substance with intent to do any of those things. *Id.* at 441 (quoting U.S.S.G. § 4B1.2(b)). The commentary provided that a "controlled substance offense" included *attempts* to commit the crimes identified in the guideline. *Id.* (quoting U.S.S.G. § 4B1.2 app. n.1). And because the commentary added a crime that wasn't

14

included in the guideline's text—attempt—we held that it conflicted with the guideline and vacated the sentence. *Id.* at 444, 449.

The obstruction enhancement applied to Maynard is different. Unlike the guideline in *Campbell*, which defined "controlled substance offense," the obstruction enhancement here doesn't define "obstruct[]" or "impede[]." Thus, unlike in *Campbell*, the commentary's interpretation of the guideline as including perjury doesn't expand the guideline's reach beyond what's explicit in its text.

Still, Maynard contends that the commentary's interpretation conflicts with the guideline because perjury and obstruction are different crimes. When a guideline term is undefined, we've relied on the interpretation of a statute criminalizing the same conduct. *See United States v. Spring*, 305 F.3d 276, 280 (4th Cir. 2002) (interpreting the word "threat" in the guideline consistently with cases interpreting statutes criminalizing "threats"). And we've recognized that proof of perjury isn't enough to convict someone of obstruction. *United States v. Grubb*, 11 F.3d 426, 437 (4th Cir. 1993).

But the rationale for treating perjury and obstruction as separate crimes doesn't apply in the sentencing context. In *United States v. Dunnigan*, the Supreme Court summarized its decisions recognizing that "simple perjury was not so much an obstruction of justice as an expected part of its administration" given that the "ordinary task of trial courts is to sift true from false testimony." 507 U.S. 87, 93 (1993) (cleaned up). But (as the Court explained) this line of cases was decided "against the background rule that the contempt power was to be confined to the least possible power adequate to protect the administration of justice against immediate interruption of its business." *Id.* (cleaned up).

15

By contrast, guideline 3C1.1 is "part of a sentencing scheme designed to determine the appropriate type and extent of punishment after the issue of guilt has been resolved." *Id.* at 94. And perjured testimony is "of obvious relevance in this regard, because it reflects on a defendant's criminal history, on her willingness to accept the commands of the law and the authority of the court, and on her character in general." *Id.* Critically, "the fact that the meaning ascribed to the phrase 'obstruction of justice' differs in the contempt and sentencing contexts would not be a reason for rejecting the Sentencing Commission's interpretation of that phrase." *Id.*

Relying on *Dunnigan*, we and every other circuit have acknowledged that guideline 3C1.1 can apply when a defendant perjures himself at trial. *See, e.g.*, *United States v. Perez*, 661 F.3d 189, 193 (4th Cir. 2011).

Maynard argues that *Dunnigan*'s analysis was dicta given that neither party contested the guideline's interpretation of obstruction as including perjury. True enough. But *Dunnigan* persuasively explains why courts treat perjury differently in the sentencing context, and we have no cause to doubt its reasoning. Thus, the district court's application of the obstruction enhancement wasn't plain error.

\*  \*  \*

For these reasons, we affirm the district court's judgment.

*AFFIRMED*