No. 208          April 3, 2024          693

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ERIC NAKIA RANEY,
*Defendant-Appellant.*

Washington County Circuit Court
19CR79122; A177094

Oscar Garcia, Judge.

Argued and submitted August 10, 2023.

Sara F. Werboff, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

PAGÁN, J.

Conviction for second-degree assault reversed and remanded; remanded for resentencing; otherwise affirmed.

**PAGÁN, J.**

Defendant appeals from a judgment in which he was convicted of one count of second-degree assault constituting domestic violence (Count 1) and one count of fourth-degree assault constituting domestic violence (Count 5).[1] Those charges stem from injuries that the state alleged defendant caused to D, his then-girlfriend. On appeal, defendant raises seven assignments of error that we address in the order they were raised. With respect to the third assignment, we exercise our discretion to review for plain error and conclude that the trial court plainly erred by not instructing the jury that it must find a culpable mental state for the physical injury element of second-degree assault on Count 1. We further conclude that, under the circumstances of this case, that error was not harmless. We thus reverse and remand Count 1, remand for sentencing, and otherwise affirm.[2]

Defendant asserts in his first assignment of error that the trial court erred in denying his motion for judgment of acquittal (MJOA). For purposes of reviewing the denial of an MJOA, "we view the evidence in the light most favorable to the state." *State v. Nickles*, 299 Or App 561, 562, 451 P3d 624 (2019). The following facts are recited with that standard in mind. To the extent that we must consider other facts or view them with a different standard in mind to address defendant's other assignments of error, we do so in conjunction with the analysis of those other assignments.

## I.  FACTS

Defendant and D lived together. In November 2019, after a night out, D drove defendant home. During the drive, defendant was intoxicated and argumentative. When they got to their apartment, D began to park, and defendant called her a "stupid cunt." D turned to defendant, swatted

---

[1] Defendant was acquitted on Count 2, second-degree assault, and Count 4, unlawful use of a weapon. The guilty verdict on Count 3, fourth-degree assault, was merged with the verdict on Count 1.

[2] We reverse and remand defendant's conviction on Count 1 and remand the case for resentencing, which includes entering a new disposition for the count that was merged into Count 1. *See State v. Cockrell*, 170 Or App 29, 31, 10 P3d 960 (2000) (reversal of conviction and affirmance of another that had been merged with it "has the effect of 'unmerging' those crimes," freeing the trial court to enter judgment and then sentence the defendant on the merged count).

his arm, and said, "I told you to never call me that again." Defendant then punched D on the left side of her face with his right arm.[3]

Defendant left the car and went into the apartment; a few minutes later, D followed. Defendant continued to shout at D as she removed her boots and started to walk down the carpeted hallway to her bedroom in the back of the apartment. D recalled walking down the hallway. However, the next thing she could remember, she was sitting on the kitchen floor with blood running down her face. D was crying and in shock; she testified that she told defendant, "I need help," to which he responded, "You're fine[,] there's nothing wrong with you."[4]

D's 16-year-old daughter, IC, was asleep in her bedroom but woke up when she heard arguing. IC recalled hearing D say, "Stop, you're hurting me," and then a thud followed by silence. IC came out of her room and found D sitting on the kitchen floor, crying. Blood was running down her face and pooling on the floor where she was sitting. Defendant was standing in the hallway and appeared "very calm." D and IC called D's friend, Saling, and then called 9-1-1. Saling headed to the apartment and arrived a few moments before emergency personnel. Saling saw a lot of blood from an "obvious head injury." D appeared disoriented. Saling cleaned up much of the blood because she did not want D's young son, C, and his friend, A, who were asleep in the apartment, to see it when they awoke.

Shortly after, Sherwood Police Officer Chad Brinkman responded along with medical personal. Brinkman spoke to defendant and defendant told him that D fell. He also spoke to D, and she said that her socks were slippery and that she had slipped. He noted that she was crying and appeared to be in pain. As a result of her head injury, D went to the hospital.

Later that morning, Brinkman and another officer returned to the apartment because D's ex-husband wanted

---

[3] That conduct constituted the fourth-degree assault charged as Count 5.

[4] That incident constituted Count 1 and Count 3, with the state's theory being that defendant pushed D, causing her to hit her head on an unknown surface.

to retrieve C and A who were still asleep at the apartment. The police briefly spoke with defendant, and that interaction was recorded by police bodycam. The video evidence showed the police knocking at the door of the residence and, after defendant answered, explaining that D's ex-husband had requested that C and A be delivered to him. The police also asked defendant about D and the severity of her injuries. Shortly after that encounter, defendant fled the apartment and did not return. Police tried to find defendant but were unsuccessful. Defendant contacted D by text, Facebook messenger, and email. In the emails, defendant expressed regret but did not admit to assaulting D. He also acknowledged that the police were looking for him. In February 2020, three months after the incident, defendant was arrested.

D sustained a two-inch-long, crescent-shaped cut to the top of her head that required 12 staples to close. D testified that the injury took months to heal and that she suffered from mild headaches, confusion, and delayed speech. Ongoing pain left D unable to style or wash her hair properly for several months and required frequent use of Tylenol. The wound left a scar in D's scalp where the hair would not grow.

The state charged defendant with second- and fourth-degree assault, among other crimes. During the trial, the court instructed all witnesses to wear masks as a precaution against COVID-19. The jury found defendant guilty of second-degree assault (Count 1) and two counts of fourth degree assault (Counts 3 and 5). The trial court merged the guilty verdict for Count 3 into Count 1.

## II.   ANALYSIS

We consider each assignment of error in the order they were raised.

### A.   *First Assignment of Error—MJOA*

Defendant contends that the trial court erred by denying defendant's MJOA on the second-degree assault charge, Count 1. Specifically, defendant argues that the state failed to present sufficient evidence of a "serious physical injury" under ORS 161.015(8), which requires a "serious

and protracted disfigurement" or "protracted impairment of health." Defendant admits that D's scar is a protracted disfigurement, but contends that, under our case law, the injury was not "serious" because the scar is not prominent.

We have addressed whether a scar qualifies as a serious disfigurement in

several cases. *See State v. Fields*, 304 Or App 763, 766-67, 468 P3d 1029 (2020) (compiling cases that discuss serious disfigurement). However, we have not established through a single principle whether a scar is considered a "serious disfigurement" and instead employ a case-by-case approach. In *Fields*, we concluded that a scar's "'prominence' is a factor to consider in determining the seriousness of the disfigurement *** [but] must be considered along with the totality of the circumstances presented in each case." *Id.* at 765. An injury is considered "prominent" if it is visible to other people under ordinary circumstances. *Id.*

We disagree with defendant that D's injury was not a "serious disfigurement" under the totality of the circumstances here. D sustained a two-inch crescent-shaped gash to her scalp. That injury required 12 surgical staples to close and left behind a visible scar where the hair did not grow back. From that evidence, a rational factfinder could conclude that D suffered a serious and protracted disfigurement. That conclusion is consistent with our jurisprudence, in which we have held that injuries that require multiple surgical staples to close and that leave behind prominent scars several inches in diameter are sufficient to constitute "serious and protracted disfigurement." *See State v. Kinsey*, 293 Or App 208, 213-14, 426 P3d 674 (2018) (concluding that two-inch scalp laceration, closed with five staples was legally sufficient to support a determination that D suffered a "protracted disfigurement," ORS 137.712(6)(c)(C), and therefore, a "significant physical injury," ORS 137.712(2)(b)(B)); *State v. Alvarez*, 240 Or App 167, 169-71, 246 P3d 26 (2010), *rev den*, 350 Or 408 (2011) (holding that a scalp injury requiring four surgical staples and leaving behind a scar visible five months after an assault was a "protracted disfigurement" and a "serious physical injury"); *Lambert v. Palmateer*, 187 Or App 528, 537-38, 69 P3d 725, *rev den*, 336 Or 125 (2003)

(concluding that "a two-inch-long, half-inch-wide divot [in the victim's forehead]" constituted "serious and protracted disfigurement" (internal quotation marks omitted)).

Thus, because D's injury could be considered a serious and protracted disfigurement, the trial court did not err in denying defendant's MJOA.

B. *Second Assignment of Error—Witnesses Wearing Masks While Testifying*

In his second assignment, defendant argues that the trial court erred by requiring witnesses to wear masks while testifying. Specifically, defendant contends that the trial court's COVID-19 masking and social distancing precautions violated defendant's constitutional right to confront witnesses.

The Sixth Amendment to the United States Constitution and Article I, section 11, of the Oregon Constitution both grant criminal defendants the right to a "face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 US 1012, 1016, 108 S Ct 2798, 101 L Ed 2d 857 (1988) (discussing federal confrontation right under Sixth Amendment to United States Constitution); *State v. Copeland*, 353 Or 816, 827-30, 306 P3d 610 (2013) (discussing Oregon confrontation right under Article I, section 11, of Oregon Constitution). The central purpose of confrontation is "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 US 836, 845, 110 S Ct 3157, 111 L Ed 2d 666 (1990).

However, the right to confront witnesses accommodates "important public policy" as long as the four elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—remain present. *Craig*, 497 US at 845-46; *cf. Copeland*, 353 Or at 822 (recognizing that, although state right "to meet the witnesses face to face" is "an unqualified statement, to be sure[,]" the framers did not intend the confrontation rule to be inflexible); *id.* at 829-30 (noting that, consistent with the federal confrontation right, the state confrontation right

seeks to prevent the use of *ex parte* evidence and favors live witness testimony at trial). Thus, a defendant's right to confront witnesses may be satisfied without traditional face-to-face confrontation at trial where (1) "denial of such confrontation is necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured." *Craig*, 497 US at 850.

Defendant contends that his confrontation rights were violated because masking may have inhibited the jury's ability to assess witness demeanor. Numerous other state and federal courts have concluded that, due to the substantial health risks created by the COVID-19 pandemic, the Confrontation Clause is not violated by having a witness testify in a criminal proceeding with a mask covering the nose and mouth. *See, e.g.*, *United States v. Maynard*, 90 F4th 706, 712 (4th Cir 2024) (concluding that the witnesses wearing masks did not, by itself, contravene the Confrontation Clause because jurors assess credibility not only by facial expressions, but also by "'the words the witnesses said *** how they said them *** their body language, their pauses, their mannerisms[,] and all the other intangible factors that are present in a trial'" (quoting *Burgess v. Goldstein*, 997 F3d 541, 554 (4th Cir 2021))); *United States v. James*, No CR-19-08019-001-PCT-DLR, 2020 WL 6081501 at *2 (D Ariz Oct 15, 2020) (concluding that "[b]ecause the covering of the nose and mouth does not significantly hinder observation of demeanor, allowing witnesses to testify while wearing masks does not materially diminish the reliability of the witnesses' testimony"); *People v. Lopez*, 75 Cal App 5th 227, 230, 290 Cal Rptr 3d 383, 384 (2022), *rev den* (Apr 27, 2022) (trial court did not err in denying defendant's pretrial motion to remain unmasked during trial and to have witnesses testify unmasked because masks were "necessary to further the public policy of ensuring the safety of everyone in the courtroom during a global pandemic of a highly infectious, potentially deadly virus"); *State v. Cuenca*, 171 Idaho 603, 609, 524 P3d 882, 888 (2023) (given necessity of masks to serve important public interest of protecting health and safety of those in the courtroom, trial court's order was sufficiently case-specific, and other aspects of testimony assured

reliability of testimony despite inability to see the mouths of witnesses).

In this case, we conclude that the trial court did not err by requiring testifying witnesses to wear masks under these circumstances. The trial court's masking and social distancing precautions served an important public policy of preventing the spread of COVID-19 and protecting the health and safety of those in the courtroom. As explained above, the primary focus of the confrontation clause is to protect the reliability of evidence offered by witnesses and ensure that a defendant and jury have adequate access to witnesses. *State v. Rockafellor*, 326 Or App 753, 759-60, 533 P3d 808 (2023). Here, despite the trial court's precautions, defendant was still able to confront witnesses and subject them to cross-examination. The jury was present and able to assess all aspects of witness demeanor except for the movements of the nose and mouth. In short, the trial court's COVID-19 masking and social distancing precautions served an important public policy and, to the extent they affected defendant's right to confront witnesses, they did not do so to any unconstitutional degree.

C.  *Third and Fourth Assignments of Error—Culpable Mental State*

In his third and fourth assignments of error, defendant contends that the trial court plainly erred under *State v. Owen*, 369 Or 288, 505 P3d 953 (2022), because the court did not instruct the jury that they were required to find that defendant acted with a culpable mental state as to the physical-injury element of second- and fourth-degree assault in order to convict him.

In *Owen,* the Oregon Supreme Court held that, in assault cases charging a "knowing" mental state, the state must prove that the defendant knew the assaultive nature of the defendant's conduct and that the defendant was at least criminally negligent as to the risk of the resulting injury. *See* 369 Or at 322 (overruling the conclusion in *State v. Barnes*, 329 Or 327, 986 P2d 1160 (1999) that no culpable mental state applied to the result element). The court further concluded that, although the state must prove that

the defendant was aware of the assaultive nature of their conduct, the state does not need to prove that the defendant knew that a physical injury would result. *Id.* at 320 (adhering to that part of *Barnes*). In *State v. Mckinney/Shiffer*, 369 Or 325, 333-34, 505 P3d 946 (2022), the court held that the trial court's failure to instruct the jury on a culpable mental state for the injury element in assault is plain error.

We may consider an unpreserved error if the error is plain. *Mckinney/Shiffer*, 369 Or at 333. "To constitute plain error, an error must (1) be one of law; (2) be obvious and not reasonably in dispute; and (3) appear on the face of the record." *Id.* Even if the error is plain, an appellate court must decide whether to exercise its discretion to consider the error, and that decision "should be made with utmost caution." *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991).

With the above principles in mind, we conclude that the trial court did not plainly err in failing to instruct the jury on the negligent risk of injury for fourth-degree assault (Counts 3 and 5).[5] The state alleged that defendant recklessly caused physical injury to D, and unlike "knowingly," the state legislature has defined the culpable mental state

---

[5] The court instructed the jury on those charges as follows:

"Count 3, Assault in the Fourth Degree—and this is the count that involves witness by a minor child, injury to the top of the head, as alleged. Oregon law provides that a person commits the crime of Assault in the Fourth Degree in the immediate presence or witnessed by a minor child if the person recklessly causes physical injury to another and the assault is committed in the immediate presence or witnessed by a minor child.

"In this case to establish the crime of Assault in the Fourth Degree in the immediate presence, witnessed by a minor child, the State must prove beyond a reasonable doubt the following elements, that the act occurred on or about November 16th, 2019, that [defendant] recklessly caused physical injury to [D] and that the assault was committed in the immediate presence or was witnessed by [D's] minor child.

"* * * * *

"Count 5, Assault in the Fourth Degree, injury to left side of face, as alleged, so Count 5, Oregon law provides that a person commits the crime of Assault in the Fourth Degree if the person recklessly causes physical injury to another.

"In this case to establish the crime of Assault in the Fourth Degree, the State must prove beyond a reasonable doubt the following elements, that the act occurred on or about November 16th, 2019, that [defendant] recklessly caused physical injury to [D].

"recklessly" to apply to both result and circumstance elements. ORS 161.085(9); *Owen*, 369 Or at 297. Here, the trial court provided the uniform instructions for "recklessly" and instructed the jury that, to find that defendant had acted recklessly, it had to find that defendant "disregard[ed] a substantial and unjustifiable risk that a particular result will occur" and that the "risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." Based on those instructions, the jury would have to find that defendant, by engaging in the assaultive conduct, disregarded a substantial and unjustifiable risk that D would suffer a physical injury. Therefore, the trial court did not plainly err in failing to give at least the criminal negligence instruction as to the physical injury element of fourth-degree assault, because it is not obvious and beyond dispute that the recklessness instruction that the court gave was legally incorrect.

However, regarding the second-degree assault conviction (Count 1), we agree with defendant that the trial court plainly erred by not instructing the jury as to the culpable mental state of at least criminal negligence for the serious physical injury element. Specifically, the court plainly erred by giving an unclear instruction that the jury was to find, as a single element, that defendant "knowingly caused serious physical injury."[6] That instruction misstated the burden in two capacities. First, it did not state that a defendant must knowingly engage in assaultive conduct. Second, it did not state that a defendant must be at least criminally negligent with respect to causing injury.

Having concluded that the trial court plainly erred, we must next determine whether the error was harmless.

---

[6] The trial court gave the uniform instruction for second-degree assault as follows:

"So in Count 1, Assault in the Second Degree, involves injury to the top of the head, as alleged, okay?

"Oregon law provides that a person commits the crime of Assault in the Second Degree if the person knowingly causes serious physical injury to another. In this case to establish Assault in the Second Degree, the State must prove beyond a reasonable doubt the following elements, that the act occurred on or about November 16th, 2019, and that [defendant] knowingly caused serious physical injury to [D]."

*Owen*, 369 Or at 334-35. We may affirm despite instructional error if an error had little likelihood of affecting the verdict. *State v. Ashkins*, 357 Or 642, 660-61, 357 P3d 490 (2015).

In considering whether instructional error was harmless, "we consider the instructions 'as a whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue.'" *Owen*, 369 Or at 323 (quoting *State v. Payne*, 366 Or 588, 609, 468 P3d 445 (2020)).

Criminal negligence requires a finding that the defendant "fail[ed] to be aware of a substantial and unjustifiable risk that the result will occur" and "[t]he risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." ORS 161.085(10). Here, the state theorized that defendant pushed D, causing her to sustain a head laceration. However, D had no memory of the push, and other than hearing D say that defendant pushed her, no witness testified about the push. Because there was no evidence of the manner of the push or its force or aggression, it is plausible that a jury might find that defendant was not aware of a risk that if he pushed D, she would sustain a head wound.

Further, even if there was evidence concerning the nature of the push, it is not a foregone conclusion that a jury would find that there was a *substantial* risk that a solitary push could cause physical injury and that defendant failed to be aware of it, or that this failure was a *gross deviation* from the standard of care of a reasonable person. *See McKinney/Shiffer*, 369 Or at 335-36 (concluding that the trial court's failure to instruct on the culpable mental state for second-degree assault was not harmless because it was not clear that a jury would find "that [the] defendant failed to be aware of a substantial risk that a solitary punch would cause a serious physical injury, or that that risk was of such a nature and degree that [the] defendant's failure to be aware of it was a *gross deviation* from the standard of care that a reasonable person would observe in the situation" (emphasis in original)).

Thus, for the above reasons, the error was not harmless. Additionally, after considering the factors set forth in *Ailes*,[7] we conclude that it is appropriate to exercise our discretion to review the plain error and correct it, based on the gravity of the error and the ends of justice. We additionally note that we have exercised our discretion to correct a similar error in the past. *See State v. Hatchell*, 322 Or App 309, 315-16, 519 P3d 563 (2022). We therefore reverse and remand the second-degree assault conviction on Count 1.

D.  *Fifth and Sixth Assignments of Error—Police Bodycam Footage*

At trial, the prosecutor moved to admit into evidence bodycam footage from a police officer who spoke to defendant at his residence a few hours after the incident. The state argued that, among other things, it showed defendant's "distracted" demeanor and "explain[ed] why [defendant] fled at that time." The court allowed the evidence to be admitted, ruling that it was relevant to the state's case and was not unduly prejudicial. In his fifth and sixth assignments of error, defendant argues that the trial court erred in admitting that footage because the evidence was not relevant to any issue in the case and was unduly prejudicial, and that the state's relevancy argument depended on an impermissible character inference.

Whether evidence is relevant is reviewed as a matter of law. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999). A trial court's decision to admit evidence over an objection that its probative value is outweighed by its prejudicial effect is reviewed for an abuse of discretion. *State v. Knight*, 343 Or 469, 484, 173 P3d 1210 (2007).

In this case, the trial court did not abuse its discretion in determining that the probative value of the evidence was not substantially outweighed by the risk of unfair

_____

[7] In deciding whether to exercise discretion to review a plain error, *Ailes* directed courts to consider factors such as:

"the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way[.]"

312 Or at 382 n 6.

prejudice under OEC 403.[8] It is well-settled that evidence of a person's flight is admissible as relevant to show consciousness of guilt. *See State v. Barr*, 62 Or App 46, 51, 660 P2d 169 (1983) (evidence that defendant fled the state after being released on bail was admissible as evidence of guilt). Here, the video—in which defendant can be seen nervously engaging with the police—permits the inference that defendant realized that he was in trouble. It thus provided relevant context for his decision to flee shortly thereafter. Further, to the extent that defendant's slightly strained interaction with police was prejudicial because it presented him, as he argues on appeal, as a "hostile" and "uncooperative" person, defendant could have requested a limiting instruction. *See State v. Terry*, 309 Or App 459, 465, 482 P3d 105 (2021) ("The evidence, although potentially inflammatory, could be addressed through a limiting instruction."). However, he did not do so. We thus conclude that the trial court did not abuse its discretion by admitting into evidence bodycam footage of defendant talking with police.

Because we reverse and remand on defendant's third assignment of error, we do not need to resolve defendant's seventh assignment of error, which contends that the trial court erred by imposing a 70-month sentence on Count 1. *See, e.g.*, *State v. Colgrove*, 308 Or App 441, 446, 480 P3d 1026 (2021) (not reaching additional claims because the case already was being remanded for resentencing).

Conviction for second-degree assault reversed and remanded; remanded for resentencing; otherwise affirmed.

---

[8] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."