# COURT OF APPEALS OF VIRGINIA

---

**Record No. 0883-24-2**

---

LAMARI NAJEK HOUSE

v.

COMMONWEALTH OF VIRGINIA

---

Present: Chief Judge Decker, Judges Ortiz and Callins

Argued at Richmond, Virginia

Opinion Issued May 19, 2026

---

**FROM THE CIRCUIT COURT OF MECKLENBURG COUNTY**
S. Anderson Nelson, Judge

John A. Terry (Vaughan C. Jones; Law Office of Vaughan C. Jones, on brief), for appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

---

**PUBLISHED OPINION BY**
**CHIEF JUDGE MARLA GRAFF DECKER**

Lamari Najek House appeals his convictions for conspiracy to commit murder, murder by mob, use of a firearm in the commission of murder, and use of a firearm in the commission of malicious wounding by mob in violation of Code §§ 18.2-22, -32, -40, and -53.1. He contends that the evidence was insufficient to support his convictions for murder by mob and "possession of a firearm by mob." He also argues, in an issue of first impression in the Commonwealth, that the trial court erred by allowing a prosecution witness to conceal his identity while testifying in open court. For the reasons that follow, we affirm the challenged convictions.

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND[2]

This case resulted from violence that erupted in the early morning hours of November 1, 2020, and ended with the murder of James Crayton and the wounding of several others.

Crayton attended a Halloween party in Mecklenburg County that ended after midnight. A flyer publicizing the event showed a photo of House, labeled with his rapper "stage name," and indicated that he was scheduled to perform at the party.

Other people in attendance that night included Martin and Richard Rhodes, as well as Eric Scott. When the party ended, Scott and Crayton walked to Richard's Mercury Montego with Richard following at a distance. As Scott and Crayton waited by the car, a group of people wearing hoods and masks approached them. Neither Scott nor Richard recognized anyone in the group, but from "the way they walked up," Scott assumed they were together. "[O]ne guy" went up to Crayton, "said what's good," and immediately punched him. As others joined in the attack, Scott found himself fighting with Jordan Williams, a close friend of House. Shortly after that, "a gunshot went off," followed by a barrage of gunfire from "different weapons."

Martin Rhodes was just returning to Richard's car when the shooting started. He saw a flash of green and was immediately shot three times. When the shooting stopped, Crayton was lying on the ground just behind the Mercury, having sustained nine bullet wounds. He was pronounced dead at the hospital.

---

[2] An appellate court "review[s] the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Barney*, 302 Va. 84, 96 (2023) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). Considering the evidence in this light requires the reviewing court "to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn []from [that evidence].'" *Tomlin v. Commonwealth*, 302 Va. 356, 361 (2023) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018) (per curiam)).

At trial, Raquan Smith[3] identified House as one of Crayton's killers. Smith testified that as he walked toward the parking area after the party, he saw House and Crayton fighting. When the fistfight broke up, House "r[a]n back towards a group of guys" at a van. Then House and at least five others "c[a]me back shooting." Smith confirmed that the group "direct[ed their gun]fire toward" Crayton.

Additional evidence linked House to the murder. Police retrieved House's iPhone from the roof of the Mercury, about six feet away from where Crayton lay on the ground. Beside the Mercury's front tire, police found a black ski mask with red numbers on it, which matched a mask House wore earlier on the evening of the murder.

A text-message chain between House and Crayton a few months before the murder, augmented by digital notes on two cell phones belonging to House, showed that money was a possible motive for the attack on Crayton. The activities of House and his companions were also documented by videos on one of House's phones, as well as his social media accounts. And the number and distribution of cartridge cases[4] at the scene showed that Crayton was a target.

House's text messages reflected that he arranged for another man to rent a fifteen-passenger van in a different city for the time period of the attack. Several videos from House's phone and social media accounts showed him in and around a large van with eleven other men on the night of Crayton's murder. In addition to House, police identified four men in that group

---

[3] As discussed more fully in Section II, the name Raquan Smith was a pseudonym.

[4] The Commonwealth's ballistics expert used the precise technical term "cartridge case" rather than "cartridge casing" in her testimony and certificate of analysis. *See* Ass'n of Firearm & Tool Mark Exam'rs, Glossary § 1, at 32 (6th ed. July 30, 2025) (defining "[c]artridge [c]ase"); *id.* §§ 1-13 (not listing or defining the term "casing" and not using it to define any other term), https://afte.org/wp-content/uploads/2025/08/AFTE-Glossary-Version-6.07302025-Current.pdf [https://perma.cc/R5HP-CSC3]; *see also Cappe v. Commonwealth*, 304 Va. 86, 88 (2025) (using the terms "cartridge cases" and "cartridge casings" interchangeably). This opinion uses the technical term throughout.

by name, including Jordan Williams, and they had a photograph of a fifth male in a distinctive sweatshirt. Two of those men appeared with House in a separate photograph of seventeen people labeled with "93 BBA," which showed members of the "Nine Trey" sect of the Bloods criminal street gang. Police identified three more men in the Bloods photo who were also present with House on the night of Crayton's murder. And during the month before the murder, House made at least three videos of himself brandishing a firearm. Two videos showed a laser attached to the firearm. In the third one, a green beam was visible, and House removed and reinserted a fully loaded magazine.

The videos on House's phone from just before the shooting showed several men, some of whom were at the scene of the murder, and five or six guns in a pile on the floor or in the hands of the people in one of the videos. In other videos, House recorded a green laser beam and said, "Please play with me tonight bitch. I got all the shooters with me." House then recorded himself in the van with the eleven other men and numerous firearms while someone commented, "I think we loaded."

Law enforcement officers found about seventy cartridge cases on the ground at the scene. The highest concentration of cases, a total of thirty-three, were collected "in close proximity to" the Mercury where Crayton was shot, and the car itself was riddled with bullet holes. Examination of the cartridge cases revealed that they had been fired from ten different guns.

The day after the murder, police received a video of an Instagram livestream from earlier that day. In the video, House made several statements, including, "On my soul, if I could I'd do it again," while waving what appeared to be a gun. He followed that with, "Fuck [a]round with a [man], BBA . . . don't . . . play[,] and ya gonna get put in your . . . place . . . ."[5]

---

[5] Police later obtained a series of notes from a cell phone House used after the murder of Crayton, who was short and thin. During the three months after the murder, he wrote that he was "cool wit[h the] li[ttle] dude" and "it was all [a]bout b[usi]ness." House further noted that he

House was convicted by a jury of conspiracy to commit murder, murder by mob, and use of a firearm in the commission of both murder and malicious wounding by mob. He was sentenced to fifty-eight years with an active sentence of forty-two years for those four crimes.[6]

ANALYSIS

House contends that the evidence was insufficient to support his convictions for murder by mob and "possession of a firearm by mob." He also argues the trial court erred by allowing a Commonwealth's witness to conceal his identity while testifying.

I. Sufficiency of the Evidence

On review of the sufficiency of the evidence to support a conviction, the appellate court will affirm the trial court's decision unless it was "plainly wrong or without evidence to support it." *Cuffee v. Commonwealth*, ___ Va. ___, ___ (Apr. 16, 2026) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)); *see Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). The trier of fact, "who has the opportunity to see and hear the witnesses, has the sole responsibility to determine the[] credibility[ and] weight to be given their testimony . . . ." *Rams v. Commonwealth*, 70 Va. App. 12, 26-27 (2019) (quoting *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010)). And "[r]easonable inferences drawn by the factfinder 'cannot be upended on appeal unless . . . the[y are] so attenuated that they push into the realm of *non sequitur*.'" *Commonwealth v. Wilkerson*, 304 Va. 92, 100 (2025) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 332 (2018) (per curiam)). The "relevant question is, after reviewing the evidence in the light most favorable to

---

"put [the] gang on him" and "his ass [wa]s done" after House "g[o]t [the] drop" with his "G22" gun. And about nine months after Crayton's murder, House wrote that "30 shots from . . . []his glock le[ft] a [cowardly man] dead."

[6] House was also convicted of two counts each of distributing drugs and obtaining money by false pretenses, and one count each of racketeering and participating in a criminal street gang following his entry of guilty pleas to those offenses. He does not challenge those convictions in this appeal. Pursuant to his guilty plea, he was sentenced for all ten crimes together, receiving a total sentence of 150 years with active time of forty-five years.

the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)); *see id.* (recognizing that this same deferential standard applies to the factfinder's interpretation of video evidence). We examine House's sufficiency challenges in light of these fundamental principles.

## A. Murder by Mob

Code § 18.2-38 contains the statutory definition of a mob. If a mob exists and one of its members commits any of numerous specified crimes, including murder, all of its members are guilty under a collective-responsibility theory. *See* Code §§ 18.2-42.1, 19.2-297.1(A)(i); *Barnett v. Commonwealth*, 73 Va. App. 111, 119 (2021).

"'Murder by mob' is a shorthand description" of the offense of "lynching" as defined in Code § 18.2-39. *Paiz v. Commonwealth*, 54 Va. App. 688, 695 (2009). The statutory scheme makes criminal responsibility for that offense unique among the mob crimes proscribed. Code § 18.2-39 provides that a mob commits a "*lynching*" if it perpetrates "[a]ny act of violence . . . upon the body of any person" and the act of violence "result[s] in [that person's] death." Further, under Code § 18.2-40, "[e]very lynching shall be deemed murder[,] . . . and every person composing a mob . . . by which any person is lynched[] shall be guilty of murder."

House acknowledged in his motion to strike at trial that the prosecution proved "the assembly of a group of people holding firearms" just prior to Crayton's killing. On appeal, he argues that to support his conviction for murder by mob, the Commonwealth had to prove that the group assembled for the specific purpose of murdering Crayton. House suggests the evidence proved, at best, "a mutual fight [that] erupted into gunfire" and did not prove he "was part of a group that formed the *intention* [to] commit a murder." (Emphasis added). Contrary to House's argument, however, the Commonwealth was not required to prove that the group *jointly*

- 6 -

formed an intent to kill—only that (1) the group House was a part of met the definition of a mob and (2) some *individual* in the mob *committed* "[a]ny act of violence" against Crayton's "body" that "result[ed] in [his] death." *See* Code §§ 18.2-38 to -40; *Barnett*, 73 Va. App. at 119-20. So we examine these two elements in turn.

### 1. House as a Member of a Mob

As the jury was instructed, a mob is "any collection of people assembled for the purpose and with the intention of committing an assault, [a] battery, or an act of violence [as defined in Code § 19.2-297.1] upon any person." *See* Code § 18.2-38. Whether a mob existed "is a question of fact 'evaluated on a case-by-case basis.'" *Barnett*, 73 Va. App. at 118 (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 635 (2011)).

Key here is whether the group formed with the intent to commit one of the listed crimes. Intent is "the purpose formed in a person's mind." *Welch v. Commonwealth*, 79 Va. App. 760, 768 (2024) (quoting *Johnson v. Commonwealth*, 53 Va. App. 79, 100 (2008)). It may be proved by circumstantial evidence, including statements and conduct before, during, and after a crime. *Johnson v. Commonwealth*, 58 Va. App. 303, 320-21 (2011); *see Smith v. Commonwealth*, 72 Va. App. 523, 537 (2020). As to collective intent, "no particular words or express agreements are required to [signal, or] effect a change in[,] a group's purpose or intentions." *Hamilton*, 279 Va. at 103 (quoting *Harrell v. Commonwealth*, 11 Va. App. 1, 7-8 (1990)). Instead, "[e]vents or emotionally charged circumstances suddenly may focus individuals toward a common goal or purpose." *Johnson*, 58 Va. App. at 320 (quoting *Harrell*, 11 Va. App. at 8). And the trier of fact—here the jury—may infer that a person "intends the natural and probable consequences of his or her acts." *Harris v. Commonwealth*, 83 Va. App. 571, 590 (2025) (quoting *Schmitt v. Commonwealth*, 262 Va. 127, 145 (2001)). "[A] jury [i]s free to apply its common sense to the

evidence and the inferences [from that evidence]." *Cuffee*, ___ Va. at ___ (citing *Wynnycky v. Kozel*, 71 Va. App. 177, 203 (2019)).

A mob, at its least-lethal level, forms with the intent to commit a battery or assault. *See* Code § 18.2-38; *Hamilton*, 279 Va. at 103. "[A] battery is the least touching of another, willfully or in anger, including . . . in the spirit of rudeness or insult." *Marshall v. Commonwealth*, 69 Va. App. 648, 655 (2019) (quoting *Edwards v. Commonwealth*, 65 Va. App. 655, 664 (2015)). An assault can be either of two types. *Blankenship v. Commonwealth*, 71 Va. App. 608, 620 (2020). One type is simply an attempted battery—an "overt act" intended to accomplish an unwanted touching coupled with "the present ability" to complete it. *See id.* The second type requires an overt act that is "'intended to place the victim in fear or apprehension of [an unwanted touching]'" and "create[s] 'such reasonable fear or apprehension.'" *Id.* (quoting *Clark v. Commonwealth*, 54 Va. App. 120, 128 (2009) (en banc), *aff'd*, 279 Va. 636 (2010)).

Defense counsel admitted in the trial court, as established by the record, that House was part of "a group of people holding firearms." And the evidence outlined below proved at the very least that, at the time of the attack, the group was assembled with the intent to assault or batter Crayton, thereby establishing that they constituted a mob.

Text messages showed that Crayton may have owed House money. About six weeks after the murder, House made a digital note on his cell phone that he "was cool wit[h the] little dude" and "it was all [a]bout b[usi]ness."

Additional evidence showed that House and some of his fellow gang members armed themselves and prepared to travel together to confront Crayton.[7] During the month before the

---

[7] Notably, a criminal actor can have "more than one intent." *See Diaz v. Commonwealth*, 80 Va. App. 286, 319 n.7 (2024) (quoting *Eberhardt v. Commonwealth*, 74 Va. App. 23, 38 (2021)). And the evidence here proved that House and his companions acted at least with the intent to assault or batter Crayton.

murder, House made at least three videos of himself brandishing a firearm, which was fully loaded in one of them. In the week before the murder, he arranged for someone else to rent a fifteen-passenger van in a city well outside the area.

On the night of the murder, House gathered with a group of men, some of whom were proved to be members of his gang, and made more videos. One video showed several men brandishing firearms or throwing them into a pile. In a second video, House said, "Please play with me tonight bitch. I got all the shooters with me." House then recorded himself in the van with eleven other men. Williams and several others brandished their firearms in the videos, and House filmed himself wearing a stocking-cap-style facemask like the one found at the scene. House and at least five other men who were with him on the night of Crayton's murder, either in the van or at the scene, were members of the Nine Trey Bloods gang.

Regarding the attack itself, evidence proved Crayton was an intended victim. When the Halloween party was over, House and several companions, all of whom wore hoods and masks, formed a group and approached Crayton as he stood in the parking area with only one other person, Scott. One of the group members greeted Crayton and immediately punched him, and then the whole group started fighting.[8] House and his friend Jordan Williams were members of the group that engaged in the attack. Williams fought with Scott, and Smith testified that House fought with Crayton. *See Johnson*, 58 Va. App. at 321; *Abdullah v. Commonwealth*, 53 Va. App. 750, 758 (2009).

The record supports the jury's finding that House and his companions were a mob under the statutory definition because they "assembled for the purpose and with the intention of committing an assault or a battery," fighting first with their fists and then using firearms. *See*

---

[8] As noted, a mob's formation of the required intent can occur "suddenly" and be proved by its actions "toward a common goal." *Johnson*, 58 Va. App. at 320 (quoting *Harrell*, 11 Va. App. at 8).

Code § 18.2-38; *Hughes v. Commonwealth*, 43 Va. App. 391, 402 (2004); *see also Secret v. Commonwealth*, 296 Va. 204, 228-29 (2018) (recognizing that whether the defendant acted with the required intent is a question of fact for the jury).

2. Act of Mob Violence Resulting in Crayton's Death

Once a mob forms, if it perpetrates "[a]ny act of violence . . . upon the body of any person" and that act "result[s] in [his] death," the mob is guilty of murder by mob. *See* Code §§ 18.2-39 to -40.

Here, after the initial mob attack with fists, House and his companions discharged their firearms at Crayton and others. Contrary to House's suggestion, the Commonwealth was not required to prove that the mob intended to kill Crayton. *See* Code §§ 18.2-39 to -40. All that was required was proof that any member of the mob committed an act of violence against Crayton that did, in fact, cause his death. *See id.*; *Corado v. Commonwealth*, 47 Va. App. 315, 326 (2005). And Smith confirmed that House and his mob companions "direct[ed their] fire toward" Crayton, proving that while functioning as a group, they committed the required act of violence against him. *See* Code § 18.2-38; *cf. Witherow v. Commonwealth*, 65 Va. App. 557, 569, 571 (2015) (holding that the use of a deadly weapon such as a firearm supports an inference of "an intent to maim, disfigure[,] or kill" (quoting *Williams v. Commonwealth*, 13 Va. App. 393, 398 (1991))). Just before the shooting started, as Martin approached the Mercury, he saw a green laser beam like the one House had displayed in a video, and he was shot three times. As the coordinated attack continued, Martin heard more than fifty gunshots, and police recovered more than seventy cartridge cases fired from ten different weapons. More than thirty cases were concentrated near the Mercury next to which Crayton had stood. Crayton himself sustained nine gunshot wounds, causing his death. The Mercury was significantly damaged by the gunfire, further proving the coordinated nature of the attack specifically against Crayton.

- 10 -

This evidence supported the jury's finding that a mob formed and committed an "act of violence" against Crayton that "result[ed] in [his] death." *See* Code §§ 18.2-39 to -40. As a result, the evidence was sufficient to support House's murder-by-mob conviction.

### B. Use of Firearm in a Malicious Wounding by Mob

House's second assignment of error suggests that the evidence was insufficient as a matter of law to support his conviction for "possession of a firearm by mob."[9]

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Pursuant to the rule, an argument "must be both *specific* and *timely*," to notify both opposing counsel and the trial court about an issue to permit correction of any error below and prevent unnecessary mistrials and appeals. *See Bethea v. Commonwealth*, 297 Va. 730, 743-44 (2019) (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)).

House made several arguments challenging his various convictions in the trial court, raising both sufficiency and double-jeopardy grounds. But he did not contest his conviction for using a firearm in the commission of a malicious wounding by mob on the statutory-construction basis he presents on appeal. He simply did not argue that he could not be convicted because "[u]se of a firearm in the commission of murder or malicious wounding[] is not a crime of violence enumerated in Code § 19.2-297.1, as incorporated in Code § 18.2-42.1."

---

[9] House's second assignment of error, as worded, suggests the evidence was insufficient to support a conviction for "possession of a firearm by mob," a crime not charged. The actual conviction was for the *use* of a firearm *in the commission of a malicious wounding* by mob. To resolve his second assignment of error on the best and narrowest ground, we assume without deciding that his erroneous wording adequately describes an offense and complies with Rule 5A:20(c). *See McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018); *see also Commonwealth v. Moncrea*, ___ Va. ___, ___ n.6 (Apr. 1, 2026) (assuming without deciding that an issue was "ripe for [the Court's] consideration"). This opinion addresses the conviction as actually charged.

Although Rule 5A:18 does not require citation to a particular statute or case in the trial court to preserve the issue for appeal, the appellant must still have "adequately presented" the underlying issue to that court for resolution. *See Watkins v. Commonwealth*, 83 Va. App. 456, 476 n.18 (2025) (quoting *Lash v. County of Henrico*, 14 Va. App. 926, 929 (1992) (en banc)). House did not argue to the trial court that he could not be convicted of the firearm offense because the underlying crime was not a crime of violence as defined in the statute. He therefore did not meet the preservation requirements of Rule 5A:18.

For the first time at oral argument, appellate counsel asked the Court to apply Rule 5A:18's ends-of-justice exception to excuse House's failure to object on this ground in the trial court. Rule 5A:20(e), however, provides that a request to apply a Rule 5A:18 exception "must" be made in the appellant's opening brief. Consequently, this request made at oral argument came too late.[10] *Cf. Jeter v. Commonwealth*, 44 Va. App. 733, 740 (2005) (holding that failing to "cite any authority" in an opening brief, as required by Rule 5A:20(e), could not be remedied in a reply brief because the appellee had "no meaningful opportunity" to respond); *Fleming v. Commonwealth*, 85 Va. App. 27, 54 (2025) (noting that this Court does not apply the Rule 5A:18 exceptions sua sponte). *See generally Doe v. Green*, 304 Va. 536, 545 & n.8 (Nov. 26, 2025) (recognizing that "an appellant's failure to raise a specific argument in her opening brief" and to cite supporting authorities waives that argument).

In short, House waived his second assignment of error and the right to seek application of the ends-of-justice exception, so we do not consider that challenge on the merits.

---

[10] House was represented by a different attorney at oral argument than at trial and on brief. Counsel's candor at oral argument was noted and is appreciated by the Court. *See Bennett v. Commonwealth*, 84 Va. App. 607, 620 n.8 (2025) (recognizing that candor by counsel "embodies the ethical duties expected of a legal advocate and is held in high esteem" (quoting *Nimety v. Commonwealth*, 66 Va. App. 432, 436 n.3 (2016))).

## II. Confrontation Clause: Witness's Concealment of His Identity

### A. Relevant Trial Proceedings

On the morning of the second day of trial, shortly before the Commonwealth called its confidential informant to testify using the pseudonym Raquan Smith, the prosecutor told the court that Smith had just reported he had "severe safety concerns" and was "very afraid" that House would recognize him. The prosecutor pointed out that House had entered a guilty plea to "gang participation" and "proffer[ed]" that the Bloods criminal street gang had both "tremendous reach" and "a reputation for violence and retribution."[11] The prosecutor made a motion to allow Smith to cover his facial tattoos using a "gator style" mask, "do-rag," and hood while leaving the area from his nose to the middle of his forehead visible to the jury. In response to the trial court's question whether Smith was "refusing to testify if [the court] d[id]n't allow this," the prosecutor replied that Smith "would refuse to testify if this [motion] was not brought forward."

House objected based on his right to confront his accusers, arguing that Smith's proposed masking would impair the jury's ability to assess the witness's credibility. He conceded that the right to confrontation is not absolute but argued that public policy interests did not justify the proposed restrictions on his right.

---

[11] House did not specifically object to the content of the proffer but contended in part that the prosecutor should have raised the issue earlier to permit "a full[-]blown . . . hearing w[ith a chance to] put on evidence" for a "greater opportunity to determine . . . the real danger." The prosecutor explained that the informant's attorney first advised him of the issue "late [the] night" before, after the first day of trial, and that he spoke to the informant himself only shortly before court convened on the second day of trial. The court took the prosecutor's motion under advisement to give defense counsel time for research and additional argument. Then the court ruled on the motion during the lunch break. On the third day of trial, the day following the motion, the lead investigator confirmed in his testimony that the gang pertinent to House's guilty plea was a "Blood sect."

The trial court granted the Commonwealth's motion, allowing Smith to mask his appearance.[12]  It found that the record established a public-policy need because House had pleaded guilty to "being part of a street gang," proffered to be a national gang described as "a Blood sect."  The court also found, for admissibility purposes, that the witness's testimony was "reliab[le]" because, despite the pseudonym, defense counsel was given "a Brady letter so that [he] could adequately cross examine . . . the witness."[13]

At the close of all the evidence at trial, the prosecutor proffered for the record additional information about what took place during Smith's testimony.  He noted that two or three people in the courtroom who were dressed in red "attempted to reposition" themselves "to get a better view of" Smith.  *See generally Hamilton*, 279 Va. at 98 (noting gang expert testimony that "Bloods wear . . . red").  The prosecutor identified one of the individuals as a member of the same criminal street gang as House and explained that the person "was arrested on an indictment for a crime of violence."  Defense counsel did not contest the factual basis for the proffer.[14]

### B.  Analysis

House contends that "allowing a prosecution witness to testify wearing a mask" violated his confrontation rights under the United States and Virginia Constitutions.  He suggests that he

---

[12] House declined the trial court's offer of a jury instruction on the witness's masking. The court granted the defense's motion barring the prosecutor from mentioning either the masking or the fact that the witness was testifying under a pseudonym.

[13] This mention of "Brady" refers to the prosecutor's duty pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny to provide the defense with all exculpatory evidence in its possession, including evidence impeaching the prosecution's witnesses.  *See Warnick v. Commonwealth*, 72 Va. App. 251, 268 (2020).  The defense was notified that Smith was a convicted felon, and Smith testified at trial that he had three prior felony convictions and a pending firearm charge.

[14] Defense counsel declined to "concede . . . any ill will" or "inappropriate" behavior by House's family or friends.  Even so, counsel said he understood that the Commonwealth made the representation in support of its argument and the court's earlier ruling to allow Smith to testify in a way that obscured his identity.

was entitled to have the jury observe Smith's facial expressions unencumbered so that it could more accurately assess his demeanor and credibility.[15]

Generally speaking, "great latitude [will be given] to the discretion of the trial [judge] as to . . . the manner of the[] examination [of witnesses]." *Proctor v. Commonwealth*, 40 Va. App. 233, 239 (2003) (first and second alterations in original) (quoting *Whitehead v. Commonwealth*, 31 Va. App. 311, 318 (2000)). Even so, appellate courts review de novo whether the manner of admitting evidence violates a defendant's constitutional right to confrontation. *See Baez v. Commonwealth*, 303 Va. 421, 430 (2024) (quoting *Cortez-Rivas v. Commonwealth*, 300 Va. 442, 444 (2022)), *aff'g* 79 Va. App. 90 (2023); *United States v. Maynard*, 90 F.4th 706, 710 (4th Cir. 2024). Any underlying factual findings made by the trial court in relation to such a challenge are entitled to deference on appeal unless plainly wrong. *Baez*, 79 Va. App. at 108; *see Castillo v. Commonwealth*, 70 Va. App. 394, 454 (2019).

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.[16] "[T]he 'literal right to "confront" the witness[es] at the time of trial' . . . form[s] 'the core of the values furthered by the

---

[15] House does not contest Smith's use of a pseudonym or suggest any potential resulting impairment of cross-examination. Nor does he assert the related due-process claims that he raised in the trial court. Consequently, we do not consider the adequacy of the hearing on the masking motion or the possibility that allowing the masking implied to the jury that House was "dangerous" or "guilty." *See generally Baez v. Commonwealth*, 303 Va. 421, 430 n.4, 433 n.5 (2024) (recognizing the principle requiring an appellate court to "decide cases 'on the best and narrowest ground[] available,'" including "avoid[ing]" the "'unnecessary adjudication of . . . constitutional issue[s],'" and limiting analysis to the aspects of an issue presented in argument on brief (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015))).

[16] Article I, Section 8, of Virginia's Constitution provides the same protections as the federal Confrontation Clause. *See Roadcap v. Commonwealth*, 50 Va. App. 732, 743-44 (2007), *cited with approval in* Stephen R. McCullough, *Virginia Constitutional Law* § 2.03[3], at 27 (2026 ed.). As a result, we analyze the federal and state confrontation claims as a single unit.

Confrontation Clause.'" *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988) (quoting *California v. Green*, 399 U.S. 149, 157 (1970)).  The clause's primary goal is to "ensure[] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  *Turner v. Commonwealth*, 63 Va. App. 401, 407 (2014) (quoting *Dearing v. Commonwealth*, 259 Va. 117, 123 (2000)).

As the Supreme Court explained in *Maryland v. Craig*, 497 U.S. 836, 846 (1990), the four "elements of confrontation" are "physical presence, oath, cross-examination, and observation of demeanor by the trier of fact."[17]  *See Cypress v. Commonwealth*, 280 Va. 305, 315 (2010).  Although "'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,'" the Supreme Court has never held that a criminal defendant has an "*absolute* right to a face-to-face meeting with witnesses against [him] at trial."  *Craig*, 497 U.S. at 844, 849 (quoting *Ohio v. Roberts*, 448 U.S. 56, 63 (1980) (emphasis added)).  Even so, that requirement may not "easily be dispensed with."  *Id.* at 850.  Rather, "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only" if two criteria are met.  *Id.*  First, the denial of confrontation must be "necessary to further an important public policy."  *Id.*  Second, "the reliability of the testimony [must be] otherwise assured."  *Id.*[18]

_____

[17] The first of these elements, physical presence, permits "a 'personal examination'" of the witness.  *Craig*, 497 U.S. at 845 (quoting *Mattox v. United States*, 156 U.S. 237, 242 (1895)).  The second, the oath, "impress[es upon] him . . . the seriousness of the matter" and uses the "penalty for perjury" to "guard[] against . . . lie[s]."  *Id.* at 845-46 (quoting *Green*, 399 U.S. at 158).  Third, the clause "forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth.'"  *Id.* at 846 (quoting *Green*, 399 U.S. at 158).  And fourth, "the jury . . . decid[ing] the defendant's fate . . . observe[s] the demeanor of the witness [as] h[e testifies], th[ereby] aiding the jury in assessing his credibility."  *Id.* (quoting *Green*, 399 U.S. at 158).  Only the fourth element is implicated here.

[18] We recognize that the confrontation here was in fact a "physical" one that took place in the courtroom.  But because it was not *fully* "face-to-face," we nonetheless find it appropriate to analyze the confrontation under *Craig*'s factors.

Public policy justifying departure from the constitutional default of face-to-face confrontation includes protecting the welfare of witnesses, as shown in *Craig*, 497 U.S. at 852-55, and our Court's decision in *Castillo v. Commonwealth*, 70 Va. App. 394, 451-52 (2019). In *Craig*, 497 U.S. at 840-41, the Supreme Court considered whether the Confrontation Clause "categorically prohibit[ed] a child witness in a child abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by one-way closed circuit television," such that the child could not see the defendant. Noting that the judge, jury, and defendant could view the demeanor of the witness, the Court held that the practice adequately preserved the defendant's confrontation right "where necessary to further an important state interest." *Id.* at 851-52. It emphasized that the "trial court must hear evidence" and make a "case-specific" finding of the "ne[ed] to protect the welfare of the particular child witness who s[ought] to testify." *Id.* at 855; *see Pitts v. Mississippi*, 607 U.S. 1, 2, 6 (2025) (per curiam) (declaring a statute unconstitutional under *Craig* because it purported to make a determination of necessity for an entire category of cases). The Court expressly declined to hold that the trial court was constitutionally required to "observe the . . . behavior" of the child witnesses "in the defendant's presence" before ruling. *Craig*, 497 U.S. at 859-60.

*Castillo* involved a specific statute that permitted a trial court, following a pre-trial hearing, to authorize "the use of [two-way] closed-circuit television for an 'alleged victim or a child witness' in criminal proceedings." 70 Va. App. at 452 (quoting Code § 18.2-67.9). The statute further required "an alleged offense against a child [in specified categories of cases] or . . . an alleged murder of a person of any age." *Castillo*, 70 Va. App. at 452 (quoting Code § 18.2-67.9). In the earlier decision of *Johnson v. Commonwealth*, 40 Va. App. 605, 611-12, 616-17 (2003), this Court had held the statute was constitutional, "both facially and as applied." In *Castillo*, 70 Va. App. at 453, the Court reaffirmed the statute's constitutionality. It reasoned

that *Craig* "allow[ed] a necessity-based exception for face-to-face, in-courtroom confrontation where the witness'[s] inability to testify in court invoke[d] a state's interest in protecting the witness." *Id.* at 452. It further noted in dicta that this exception was not "limit[ed] . . . to child abuse cases." *Id.*; *see Horn v. Quarterman*, 508 F.3d 306, 319-20 (5th Cir. 2007).

Here, we conclude that the same rationale set forth in *Craig* and *Castillo* applies to adult witnesses when necessary to "protect[]" them "from physical danger or suffering," as long as the assurance-of-reliability prong of the *Craig* test is also satisfied. *See Horn*, 508 F.3d at 313, 320 (terminally ill witness); *see also United States v. Gigante*, 166 F.3d 75, 79-82 (2d Cir. 1999) (same). *See generally Guam v. Camacho*, 2025 Guam 16, 43 (noting that a "majority of state courts" hold "*Craig* applies to testimony from an adult witness via two-way video"). An adult witness may testify in court in a fashion that limits the ability to see distinctive facial features when the trial court makes the additional required specific finding that this approach is necessary to advance the "state's interest in protecting the witness," thereby also satisfying the important-public-policy prong of the analysis. *See Horn*, 508 F.3d at 320; *cf. Pitts*, 607 U.S. at 5-6 (using a screen to separate a witness from the defendant).

Supporting this outcome is the application of *Craig* in *United States v. Maynard*, 90 F.4th 706, 711 (4th Cir. 2024), to uphold a masking requirement imposed by a district court because of the COVID-19 pandemic.

The United States Court of Appeals for the Fourth Circuit in *Maynard* ruled first that "[p]rotection against the spread of COVID-19 [wa]s no doubt an 'important public policy' interest" at the time of the defendant's 2021 trial. *Id.* at 710 (quoting *Craig*, 497 U.S. at 850); *see id.* at 711 (noting the advice of the Centers for Disease Control and Prevention).

Second, the Court held that "the reliability of the witnesses' testimony in th[e] case was 'otherwise assured.'" *Id.* at 711 (quoting *Craig*, 497 U.S. at 850). It reasoned that the witnesses

were physically present, under oath, and subject to cross-examination. *Id.* at 711-12. Although acknowledging Maynard's claim that "the masks hindered the jury's ability to assess the witnesses' credibility," the Fourth Circuit noted the myriad remaining cues available for the jurors' consideration in evaluating demeanor. *Id.* at 712. Under those circumstances, the Court held that the procedure "preserved the Confrontation Clause's core principles—physical presence and the opportunity for cross-examination." *Id.*; *see State v. Raney*, 547 P.3d 172, 177-78 (Or. Ct. App. 2024) (applying *Maynard* and citing other cases doing so).

House does not dispute that *Craig* provides the applicable framework and test but challenges the way in which the trial court applied the test. (Oral Arg. Audio 4:40-5:10). We agree that the *Craig* framework applies and examine the test's public-policy and reliability prongs as relevant in this case.

### 1. The Important-Public-Policy Prong of *Craig*[19]

"*Craig* plainly requires a public [policy] interest more substantial than [merely] convicting someone of a criminal offense." *United States v. Abu Ali*, 528 F.3d 210, 241 (4th Cir. 2008). Similarly, a "generalized interest in law enforcement," standing alone, is not "sufficient to satisfy the first prong of *Craig*." *Id.* Nor can a "[s]tate's administrative convenience and budgetary concerns . . . outweigh [a defendant]'s Sixth Amendment [confrontation] rights." *Brumley v. Wingard*, 269 F.3d 629, 644 (6th Cir. 2001). But the state's interest in protecting witnesses is an important public policy goal justifying limits on confrontation. *See, e.g.*, *Craig*, 497 U.S. at 852-55; *Castillo*, 70 Va. App. at 451-52; *Maynard*, 90 F.4th at 710-11. And the

---

[19] Where the circumstances involve allowing a *child* witness to testify from a *secondary location*, *Craig* and *Castillo* require three subsidiary findings under the public-policy criterion proving a need to ensure the welfare of the particular child. *Castillo*, 70 Va. App. at 453 (citing *Craig*, 497 U.S. at 855-56). In *Maynard*, 90 F.4th at 710-12, which involved safety concerns for *all in-person* witnesses, the Fourth Circuit did not apply any similar subsidiary components. We likewise conclude that no subsidiary components apply in the context here of an adult witness present in the courtroom.

- 19 -

nature of the crime can be relevant in conducting this assessment. *See Craig*, 497 U.S. at 853-57 (considering the nature of the crime of child abuse, its prevalence, and the need to protect child witnesses); *Abu Ali*, 528 F.3d at 241 (considering the dangers posed by terrorist attacks).

In the instant case, the trial court found that the evidence met the public-policy prong because House pleaded guilty in the same proceeding to being a member of a national criminal street gang known for violence and retribution, and the witness was afraid and said he would not testify without hiding his identity. *Cf. Jin v. Commonwealth*, 67 Va. App. 294, 308 (2017) (recognizing a trial court has discretion to "limit[] . . . inquiry" into a prosecution witness's "potential bias" due to concerns over "harassment" and "witness[] safety" (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986))). Although the trial court relied largely on the prosecutor's proffer rather than sworn testimony or documentary evidence as the basis for its public-policy necessity finding, *Craig* does not mandate any particular form of evidence. It requires only a "case-specific" finding. *Craig*, 497 U.S. at 855; *see Pitts*, 607 U.S. at 5-6 (applying *Craig*'s case-specific requirement to prevent reliance on a purported statutory determination of necessity for an entire category of cases). Here, the trial court did not rely on a mere categorical or statutory determination of necessity. Instead, it considered the specific circumstances of this witness and this case, including the nature of the charged offenses, House's guilty plea to gang membership, and the witness's stated refusal to testify.

Additionally, the Commonwealth had a strong public-policy interest in convicting an alleged murderer, particularly one who enlisted the aid of numerous others, including members of his criminal street gang, to ambush the victim in a public location by unloading more than seventy rounds of ammunition. *Cf. Castillo*, 70 Va. App. at 452 (applying a statute reflecting a legislative determination that the Commonwealth's interest in convicting a murderer may permit using closed-circuit television for a "child witness" or "alleged victim" (quoting Code

§ 18.2-67.9)). Here, therefore, the record demonstrates a legitimate state interest in protecting the witness. Although a more developed evidentiary record could have strengthened the finding, the record before the court was sufficient to support its case-specific determination of necessity under *Craig* and *Pitts*.

House argues the prosecution "acknowledged that the witness was [merely] 'hesitant to testify' without the disguise but had not refused." We disagree. Viewing the evidence in the light most favorable to the Commonwealth, the trial court did not err by implicitly accepting the prosecutor's proffer as establishing that the confidential informant had, in fact, refused to testify if not allowed to physically hide his identity.[20] *See Castillo*, 70 Va. App. at 454-55 (requiring deference to the trial court's findings of fact and reasonable inferences from those facts); *see also Hill v. Commonwealth*, 297 Va. 804, 808 (2019) (holding, in reviewing the denial of a motion to suppress, that an appellate court must "presume—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities . . . in the evidence in favor of the prevailing party"); *Harris v. Joplin*, 304 Va. 338, 351 (2025) (holding, in reviewing the circuit court's evidentiary ruling, that the Court of Appeals erred by "neither []view[ing] the evidence in the light most favorable to [the prevailing party] nor deferr[ing] to the circuit court's implicit factual findings in [his] favor").

House also argues "there was no showing that the witness faced any specific danger" because "[n]umerous witnesses testified unencumbered at trial." Although this claim, standing alone, does not necessarily preclude the trial court's ruling with regard to Smith, the claim is refuted by the record. The argument fails to recognize that Smith was the only witness who specifically identified House as the person who engaged in a fistfight with Crayton and then fired

---

[20] We do not hold that a witness must refuse to testify without a mask before a trial court may permit him to obscure his identity. We hold only that refusal is a factor for consideration.

a gun at him. As a result, Smith's testimony fell into a category by itself with regard to the threat that House's fellow gang members might have posed to him if his true identity were known. *Cf. United States v. Ramos-Cruz*, 667 F.3d 487, 501 (4th Cir. 2012) (recognizing that concern over witness safety in an alleged gang case could justify using a pseudonym, regardless of whether "the threat . . . c[a]me[] directly from [the] defendant or from another source" (quoting *United States v. Celis*, 608 F.3d 818, 832 (D.C. Cir. 2010) (per curiam))).

Consequently, the record demonstrates that the trial court made the required specific public-policy findings to support its ruling that the Commonwealth's confidential informant could cover his head, neck, and mouth while testifying, leaving the area from his nose to the middle of his forehead visible.

### 2. The Reliability-Otherwise-Assured Prong of *Craig*

In *Craig*, 497 U.S. at 855-57, the Supreme Court approved, as sufficiently reliable for confrontation purposes, the use of a one-way video that prevented the child-witness from seeing the defendant. And our Court, like many others, has approved a procedure involving two-way video, permitting the witness and the accused to see each other. *See, e.g.*, *Johnson*, 40 Va. App. at 615; *Abu Ali*, 528 F.3d at 242; *State v. Rogerson*, 855 N.W.2d 495, 502-03 (Iowa 2014).[21]

The procedure used in the instant case, in which the witness was present in the courtroom with House and the jury, certainly provided greater reliability than the one-way procedure in *Craig*. Fundamentally, "[i]t is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'" *Coy*, 487 U.S. at 1019, *quoted with approval in Craig*, 497 U.S. at 846. And although a two-way video is better than one-way viewing, live testimony in a courtroom

---

[21] "[T]wo-way closed-circuit television creates an encounter that more closely approximates a face-to-face confrontation than a one-way closed-circuit television does because a witness can view the defendant . . . ." *United States v. Bordeaux*, 400 F.3d 548, 554 (8th Cir. 2005).

- 22 -

surpasses both. It is only logical that "a defendant watching a witness through a monitor will not have the same truth-inducing effect as an unmediated gaze across the courtroom." *United States v. Bordeaux*, 400 F.3d 548, 554 (8th Cir. 2005); *see also United States v. Carter*, 907 F.3d 1199, 1208 n.4 (9th Cir. 2018) ("[E]quating a two-way video procedure with face-to-face confrontation necessarily neglects the 'intangible elements' of confrontation that . . . may be 'reduced or even eliminated by remote testimony.'" (quoting *Gigante*, 166 F.3d at 81)).

Further, and importantly, factfinders' credibility determinations turn on many factors. It stands to reason that allowing a witness to obscure some parts of his face, by itself, does not contravene the Confrontation Clause and, depending on the circumstances, can meet the reliability-assurance component of *Craig*. *See Maynard*, 90 F.4th at 712; *see also Morales v. Artuz*, 281 F.3d 55, 60-61 (2d Cir. 2002) (holding that sunglasses only "minimal[ly] impair[ed]" confrontation). Here, first, not all of the witness's facial expressions were obscured. Only the top of his head and his mouth, neck, and ears were fully covered. The jury could see the witness's nose, eyes, and the lower half of his forehead. As a result, the jury could assess things like whether the witness made eye contact or averted his gaze, as well as whether he furrowed his brow in confusion or raised it in surprise. *See Morales*, 281 F.3d at 60 (noting how a witness's eyes can impact credibility). Second, "jurors [also] assess credibility . . . by 'the words the witnesses sa[y,] . . . how they sa[y] them[,] . . . their body language, their pauses, their mannerisms[,] and all the other intangible factors . . . in a trial." *Maynard*, 90 F.4th at 712 (fourth, seventh, and eighth alterations in original) (quoting *Burgess v. Goldstein*, 997 F.3d 541, 554 (4th Cir. 2021)). So in addition to being able to see Smith's nose, eyes, brows, and forehead, the rest of his body was in plain view. The jury could still "a[nalyze] the delivery of [hi]s testimony, notice any evident nervousness, and observe h[is] body language," in conjunction with assessing "the substance of h[is] testimony, . . . h[is claimed] opportunity to observe, the

consistency of h[is] account, . . . and all the other traditional bases for evaluating testimony." *Morales*, 281 F.3d at 61-62.

Allowing the witness to cover his head, neck, and lower face, leaving his nose, eyes, brows, and forehead visible, while "testif[ying] live, in person, under oath, subject to cross-examination, and . . . [in view of] the defendant and jury[,] . . . preserved the Confrontation Clause's core principles—physical presence and the opportunity for cross-examination." *See Maynard*, 90 F.4th at 712. In the instant case, the evidence supports a finding that the reliability of Smith's testimony was otherwise assured. House was fully aware of the witness's criminal history and does not suggest any impairment of cross-examination. Defense counsel thoroughly cross-examined Smith at trial about his delay in coming forward, as well as about his prior convictions for robbery and drug distribution and a pending charge for possession of a firearm by a convicted felon. Smith admitted he was facing a mandatory five-year sentence for the firearm charge, had been given a reduced sentence for a prior offense after serving as a confidential informant, and hoped to receive less time for his pending charge after testifying at House's trial.

This record supports the trial court's conclusion that the two prongs of the *Craig* test were met. The Commonwealth had a strong public-policy interest in protecting a witness in a murder-by-mob trial that justified allowing the witness to obscure a portion of his face to hide his identity while testifying in court and that the degree of confrontation allowed was sufficient to preserve House's constitutional right.

CONCLUSION

We hold the evidence was sufficient to support House's conviction for murder by mob because it proved the existence of a mob that committed an act of violence against Crayton, causing his death. House did not properly preserve his specific challenge to his conviction for using a firearm in the commission of malicious wounding by mob under Rule 5A:18, so we do

- 24 -

not consider that assignment of error. Finally, applying the two-pronged test of *Craig*, adopted by this Court in *Castillo*, we hold the evidence supports the trial court's finding that House's confrontation rights were not violated by allowing a key prosecution witness to cover his head, neck, and a portion of his face to hide his identity while testifying in open court. Consequently, we affirm the challenged convictions and remand the case to the trial court for the sole purpose of correcting a clerical error in the sentencing order.[22]

*Affirmed and remanded.*

---

[22] The sentencing order properly reflects that the appellant was found guilty of conspiracy to commit murder. The order, however, cites only the applicable murder statute, Code § 18.2-32. We remand to the trial court to correct the omission from the sentencing order of the specific statute proscribing the crime of conspiracy, Code § 18.2-22. *See* Code § 8.01-428(B); *Howell v. Commonwealth*, 274 Va. 737, 739 n.*, 742 (2007); *Wilson v. Commonwealth*, 66 Va. App. 9, 20 n.5 (2016).